FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2013 NOV -4 PM 12: 48

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 68679-8-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ROBIN LEE DAVIS, | ) | PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | FILED: November 4, 2013 |

SPEARMAN, A.C.J. — Repossession agent Robin Davis and two co-defendants, while repossessing two cars owned by the same family, forced the driver and a passenger of one of the cars to get out at gunpoint and take them to the second car. Davis was convicted of two counts of kidnapping in the second degree and two counts of assault in the second degree. On appeal, he claims (1) the assault merged with the kidnapping for each victim; (2) the trial court erroneously gave an initial aggressor instruction; (3) the court erroneously permitted rebuttal testimony about repossession industry standards; and (4) the to-convict instruction for kidnapping omitted an essential element. We agree regarding merger and reject his remaining claims. We remand for vacation of the assault convictions and for resentencing, and otherwise affirm.

FACTS

Robin Davis and Jeffrey Saunders were partners in Allstate Recovery, an automobile repossession business. On September 10, 2010, Davis drove his truck from Auburn, Washington to Mount Vernon to repossess a Ford Explorer on behalf of a client who had sold two cars to Rachel Valdez. Saunders and Davis's adult son, Chet Davis (Chet)[1], were Davis's passengers. The client was monitoring the location of Rachel Valdez's cars by GPS and informing Saunders of their location.

Saunders directed Davis to a KFC restaurant in Mount Vernon, where they spotted the Explorer in the drive-through lane. It was evening and starting to get dark. Davis parked near the exit of the drive-through and Saunders got out of the truck to approach the Explorer. Rachel Valdez's husband, Salvador Valdez (Valdez), was driving the Explorer. Valdez's passengers were his sister, niece, and 15-year-old son, J.V. Saunders yelled, knocked and pressed on the passenger-side window, and ordered Valdez to pull forward. As Valdez drove forward he saw Davis's truck parked in a way that blocked him from passing. Valdez floored the Explorer, jumped the curb, and drove away, almost striking Saunders. Valdez dropped off his sister and niece at their home.

Saunders and Davis then drove to Marysville to attempt a repossession of the second vehicle. En route, they observed Valdez's Explorer ahead of them. Davis followed the car into the parking lot of a Burger King. Valdez and J.V. noticed the truck following them and believed it was the same one from KFC. In the parking lot, Saunders, Davis, and Chet got out of the truck and went to the

---

[1] For ease of reference, Chet Davis will be referred to by his first name.

Explorer. Davis aimed a shotgun at the Explorer while yelling at the occupants to get out. According to J.V. and Valdez, one of the other men had a pistol and aimed it at them while standing in front of the Explorer. J.V. and Valdez got out of the Explorer. Saunders patted down Valdez, pulled his wallet out of his pocket, and gave the wallet to Davis, saying, "Hold this in case he runs." Verbatim Report of Proceedings (VRP) at 99-100, 157. J.V. testified that a pistol was pointed at him and that he felt a gun at his back. Saunders told Valdez he was going to jail for trying to run him over and that they were going to repossess the Explorer. Saunders ordered Valdez to take them to the second car. He made J.V. get into the truck with Davis and Chet and made Valdez get into the Explorer, with Saunders driving. Two witnesses observed the incident at Burger King and called 911.

After Saunders began driving to the location of the second car, with Davis's truck following, Valdez told Saunders he was diabetic and needed sugar. Both cars stopped at a convenience store and Valdez went inside. By the time he exited, the police had located the party at the convenience store. The police ordered everyone out of the vehicles and arrested Davis, Saunders, and Chet. A search of Davis revealed three rounds of ammunition. A pistol and a shotgun was found on the back seat of the truck.[2]

The State charged Davis with one count of kidnapping in the first degree, one count of kidnapping in the second degree, and two counts of assault in the second degree. The State alleged that he was armed with a firearm for each count. Saunders was charged with the same four counts, also with firearm

---

[2] Both firearms were tested and determined to be operable.

enhancements, plus one count of unlawful possession of a firearm by a convicted felon. Chet pleaded guilty to unlawful imprisonment.

Davis and Saunders were tried together. Saunders testified that he had been in the vehicle repossession business since 1997 and had learned how to conduct repossessions on the job. He testified that there were no laws specifically governing repossessions in Washington. Several times during his testimony, he referenced repossession industry standards. At the conclusion of the defense's case, the State sought to introduce testimony from Harlow Cody, an experienced repossession agent. Davis objected, arguing it was not relevant to the defense's case and related to collateral matters. The court permitted Cody to testify that there were laws governing vehicle repossessions in Washington and to testify in response to Saunders' testimony about industry standards.

At the conclusion of the State's case, the trial court granted the defense's motion to dismiss the charge of kidnapping in the first degree based on insufficient evidence. The court allowed the State to amend that charge to kidnapping in the second degree.

The trial court gave the jury the defense's requested lawful use of force instruction, including a self-defense instruction. The self-defense instruction was based on Saunders' testimony that Valdez drove the Explorer toward Chet in the Burger King parking lot and that Saunders aimed the shotgun at the Explorer to make Valdez stop. Over the defense's objection, the trial court also gave the State's requested initial aggressor instruction.

4

The jury found Davis guilty of two counts of kidnapping in the second degree and two counts of assault in the second degree and also found he had been armed with a firearm for each count.[3] At sentencing, the court determined that the assault and kidnapping convictions for each victim were the same criminal conduct and adjusted Davis's offender score to a "2."[4] Clerk's Papers at 22; 68; 111. The sentencing range for each count was 13 to 17 months. Davis argued for an exceptional sentence of no time on the standard range sentence due to the mandatory time for the firearm enhancements. The court found two mitigating factors justified an exceptional sentence and imposed no time on the charges, followed by four consecutive 36-month sentences for the firearm enhancements. Davis appeals.

## DISCUSSION

Davis claims that (1) the kidnapping and assault of each victim merged; (2) the trial court erred in giving the initial aggressor instruction; (3) the court erred in permitting rebuttal testimony about repossession industry standards; and (4) the to-convict instruction for kidnapping omitted an essential element of the crime.

### Merger

Merger issues involve questions of law reviewed de novo.[5] State v. Freeman, 153 Wn.2d 765, 770, 108 P.3d 753 (2005) (citing State v. Johnston, 100

---

[3] The jury found Saunders guilty of two counts of kidnapping in the second degree while armed with a firearm and acquitted him of two counts of assault in the second degree and unlawful possession of a firearm. Saunders appealed separately. See State v. Saunders, 2013 WL 5729805, at *2-7 (Oct. 21, 2013).

[4] Because each crime was violent, it counted as "2" in computing the offender score.

[5] A double jeopardy challenge is a constitutional claim that may be raised for the first time on appeal. Freeman, 153 Wn.2d at 770. Davis did not waive this claim by failing to raise it below.

Wn. App. 126, 137, 996 P.2d 629 (2000)). The State may bring multiple charges arising from the same criminal conduct in a single proceeding. State v. Kier, 164 Wn.2d 798, 803, 194 P.3d 212 (2008) (citing State v. Michielli, 132 Wn.2d 229, 238-39, 937 P.2d 581 (1997)). However, state and federal constitutional protections against double jeopardy prohibit multiple punishments for the same offense. "Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense." Freeman, 153 Wn.2d at 771 (internal quotation marks and citation omitted). Because the legislature has the power to define offenses and set punishments, the determination of a double jeopardy violation turns on legislative intent. Id. at 771-72.

Merger is a doctrine of statutory interpretation used to determine whether the legislature intended to impose multiple punishments for a single act that violates several statutory provisions.[6] In re Pers. Restraint of Fletcher, 113 Wn.2d 42, 50-51, 776 P.2d 114 (1989). The doctrine applies

> where the Legislature has clearly indicated that in order to prove a
> particular degree of crime (e.g., first degree rape) the State must
> prove not only that a defendant committed that crime (e.g., rape) but
> that the crime was accompanied by an act which is defined as a
> crime elsewhere in the criminal statutes (e.g., assault or kidnapping).

Id. at 51 (quoting State v. Vladovic, 99 Wn.2d 413, 421, 662 P.2d 853 (1983)). If the doctrine applies, we presume the legislature intended to punish both offenses through a greater sentence for the greater offense. Freeman, 153 Wn.2d at 772-

---

[6] Although there are several steps to determine the existence of a double jeopardy violation, Davis only argues that merger applies. Therefore, we will focus on the merger doctrine.

73. Even if charges appear to merge, however, they may be punished separately if there is an independent purpose or effect to each. Id. at 773.

Although unlawful imprisonment is not specifically designated by statute as a lesser degree of kidnapping, for several reasons, we conclude that for purposes of the merger analysis, it should be considered as such.[7] The statutes defining kidnapping (RCW 9A.40.020 for kidnapping in the first degree, RCW 9A.40.030 for kidnapping in the second degree) and unlawful imprisonment (RCW 9A.40.040) are found consecutively in chapter 9A.40 RCW. Unlawful imprisonment is also a lesser included offense of kidnapping. State v. Russell, 104 Wn. App. 422, 449 n.61, 16 P.3d 664 (2001) (citing State v. Hansen, 46 Wn. App. 292, 296, 730 P.2d 706 (1986)). Furthermore, the purpose of the merger doctrine is to determine whether the legislature intended multiple punishments for a single act that violates several statutory provisions. Fletcher, 113 Wn.2d at 50-51. Here, the lesser crime of unlawful imprisonment can be raised to the greater crime of kidnapping in the second degree by conduct criminalized separately under the second degree assault statute. A person commits unlawful imprisonment if the person knowingly restrains another person. RCW 9A.40.040(1). A person commits second degree kidnapping if the person intentionally abducts another person under circumstances not amounting to first-degree kidnapping. RCW 9A.40.030(1). "'Abduct' means to restrain a person by either (a) secreting or holding him or her in a place where he or she is not likely to be found, or (b) using or threatening to use deadly force." RCW 9A.40.010(1). "Restrain" is defined, in relevant part, as,

---

[7] There is no lesser degree of kidnapping than kidnapping in the second degree.

7

to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty.

RCW 9A.40.010(6). One means of abducting a person, i.e., committing the crime of second degree kidnapping, is to restrain the person by "using or threatening to use deadly force." RCW 9A.40.010(1). But when the restraint is accomplished without the use of such force, the result is the lesser offense of unlawful imprisonment. Assault in the second degree is committed, among other ways, by assault with a deadly weapon. RCW 9A.36.021(1)(c). Thus, in certain cases an assault with a deadly weapon can constitute the use or threatened use of deadly force that raises unlawful imprisonment to kidnapping in the second degree. We conclude that the merger doctrine is not precluded here simply because unlawful imprisonment is not a lesser degree of kidnapping in the second degree.

The State asserts the merger doctrine does not apply because, to prove kidnapping in the second degree, it was not required to prove assault in the second degree.[8] We disagree. As charged and proved in this case, in the absence of the State proving that Davis committed the crime of second degree assault by means of a deadly weapon, Davis could have been convicted only of the lesser crime of unlawful imprisonment.

The State's reliance on State v. Taylor, 90 Wn. App. 312, 950 P.2d 526 (1998), a case decided in Division II of our court, is misplaced. In Taylor, the court

---

[8] The State also argues that the court need not employ the merger doctrine because the legislature indicated in RCW 9.94A.533 that it intended multiple punishments for each firearm enhancement found by the jury. This argument presupposes that the assaults did not merge with the kidnappings. The State is correct to the extent that if the counts did not merge, the trial court properly imposed four consecutive terms for the firearm enhancements under RCW 9.94A.533. But this does not answer the question as to whether the assaults and kidnappings merged.

rejected the defendant's argument that his convictions for kidnapping in the second degree and assault in the second degree merged. The court concluded that because "the threat or use of deadly force is not synonymous with the commission of second degree assault with a deadly weapon," the legislature did not clearly intend one crime to be an element of the other. Taylor, 90 Wn. App. at 320. Furthermore, the court observed, second degree kidnapping and second degree assault arose in different chapters of the penal code, and the statutes criminalizing the offenses had different purposes. Id. Thus, the court held, the crimes did not merge.

Taylor is inapposite for two reasons. First, the court did not address the issue presented here, whether the State had to prove the act that constituted the assault in order to elevate a lesser crime to kidnapping in the second degree. Thus, in determining legislative intent, the court did not consider whether the presumption that the legislature intended to punish both offenses through a greater sentence for the greater offense applied. See Freeman, 153 Wn.2d at 772-73. Second, in cases after Taylor, courts discussing merger have focused on the manner in which the offenses were charged and proved in a particular case and asked whether the State was required to prove the act constituting the merging crime to elevate the other crime. That is, courts have not simply looked at the crimes in the abstract, as the court did in Taylor.

In Freeman, the Washington Supreme Court considered whether, in the consolidated case of State v. Zumwalt, convictions for robbery in the first degree and assault in the second degree merged. Freeman, 153 Wn.2d at 770. Zumwalt

9

had punched the victim in the face and robbed her. Id. The robbery was based on the infliction of bodily injury alternative means, and the assault was based on the reckless infliction of bodily harm alternative means. State v. Zumwalt, 119 Wn. App. 126, 129-32, 82 P.3d 672 (2003). The Court stated that, to prove robbery in the first degree as charged and proved, the State had to prove Zumwalt committed an assault in furtherance of the robbery. Freeman, 153 Wn.2d at 778. The convictions merged for double jeopardy purposes because "[a]s charged and proved, without the conduct amounting to assault," Zumwalt "would be guilty of only second degree robbery." Id. at 778.

Similarly, in State v. Esparza, 135 Wn. App. 54, 143 P.3d 612 (2006), this court looked at how the offenses at issue—assault in the second degree and attempted robbery in the first degree—were charged and proved. We noted that the State had to prove only that the defendant was armed with a deadly weapon to elevate attempted robbery to attempted robbery in the first degree, and that it was charged and proved that the defendant was so armed. Id. at 66. We explained, "Since it was unnecessary under the facts of this case for the State to prove that Beaver engaged in conduct amounting to second degree assault in order to elevate his robbery conviction, and because the State did prove conduct not amounting to second degree assault that elevated Beaver's attempted robbery conviction, the merger doctrine does not prohibit Beaver's conviction for both attempted first degree robbery and second degree assault." Id.

In light of these cases, to the extent Taylor can be read for the holding that kidnapping in the second degree and assault in the second degree may never

merge, we disagree. As in Freeman, we will look at how the offenses here were charged and proved. Here, the act constituting assault in the second degree (i.e., assault with a deadly weapon) was Davis's act in pointing the gun at the victims. That same act constituted the threatened use of deadly force that was the means by which the State charged and proved that Davis committed kidnapping in the second degree: by restraining Valdez and J.V. through the threatened use of deadly force.[9] Without the conduct amounting to assault in the second degree, Davis would have been guilty only of the lesser offense of unlawful imprisonment. The State did not allege or prove a different act constituting the threatened use of deadly force other than the pointing of the gun at the victims. Stated differently, under these facts, the State was required to prove that Davis engaged in the conduct amounting to second degree assault to elevate unlawful imprisonment to second degree kidnapping. Thus the assault as to each victim merged with the kidnapping as to that victim.

Even if crimes would otherwise merge, they can be punished separately if they had an independent purpose or effect. Freeman, 153 Wn.2d at 773. Davis argues that the firearms were used to stop Valdez's car and effectuate the kidnapping, thus there was no independent purpose or effect. The State does not argue otherwise, and we agree with Davis. We hold the assault merged with the

---

[9] The jury instructions included only the "using or threatening to use deadly force" alternative means of abducting, not the "secreting" alternative means.

11

No. 68679-8-I/12

kidnapping as to each victim and remand for (1) vacation of the assault

convictions[10] and (2) resentencing.[11]

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

## Initial Aggressor Instruction

Whether sufficient evidence justified an initial aggressor instruction is a question of law reviewed de novo. State v. Bea, 162 Wn. App. 570, 577, 254 P.3d 948, rev .denied, 173 Wn.2d 1003 (2011). In determining whether the evidence was sufficient, we consider the evidence in the light most favorable to the party who requested the instruction. Id. (Citing State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000). An initial aggressor instruction must be supported by credible evidence that the defendant provoked the need to act in self-defense. State v. Riley, 137 Wn.2d 904, 909-10, 976 P.2d 624 (1999). Such an instruction is properly given when "(1) the jury can reasonably determine from the evidence that the defendant provoked the fight; (2) the evidence conflicts as to whether the defendant's conduct provoked the fight; or (3) the evidence shows that the defendant made the first move by drawing a weapon." State v. Anderson, 144

---

[10] The State concedes that if an offense is vacated, the associated firearms enhancement must be vacated. We accept the concession. When a court finds convictions for two offenses violate the double jeopardy proscription against multiple punishments it must vacate one of the convictions. State v. Turner, 169 Wn.2d 448, 468-69, 238 P.3d 461 (2010). If an offense is vacated and the defendant is not sentenced for it, RCW 9.94A.533 does not provide a basis for imposing a term for the corresponding firearm enhancement. See RCW 9.94A.533(e) (making firearm enhancements mandatory "for all offenses sentenced under this chapter").

[11] Davis suggests that prevailing on his merger claim (i.e., having two of the four firearm enhancements vacated) requires his sentence to be reduced to six years from twelve. We disagree and remand for resentencing. The trial court imposed no time for the substantive offenses, and it is unclear how it would have sentenced Davis had it found merger.

12

Wn. App. 85, 89, 180 P.3d 885 (2008) (citing Riley, 137 Wn.2d at 909-10). Words alone do not constitute sufficient provocation. Riley, 137 Wn.2d at 911.

Here, the trial court gave the jury the defense's requested lawful use of force instruction, including a self-defense instruction and a citizen's arrest instruction.[12] Davis's self-defense claim was that he aimed the shotgun at the Explorer to bluff Valdez into stopping because he believed the car was going to hit Chet. The self-defense instruction was properly given because there was testimony from the defense that Valdez tried to hit Chet.[13] The court also gave the following initial aggressor instruction:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense or defense of another and thereupon use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense or defense of another is not available as a defense.

CP at 84.

An initial aggressor instruction was proper if there was sufficient evidence that the defendants provoked Valdez into trying to hit Chet, thus prompting Davis's

---

[12] The self-defense instruction stated that "[t]he use of force upon or toward the person of another is lawful whenever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person, in case the force is not more than is necessary." CP at 82.

[13] Both the self-defense claim and the initial aggressor instruction were relevant only if the jury first believed the defense's evidence that Valdez tried to hit Chet with the Explorer. Davis testified that when Saunders and Chet got out of the truck, Valdez accelerated toward Chet, at which point Davis pulled a shotgun out of the truck and pointed it at the Explorer. But Amber Spady, who witnessed the incident at the Burger King, testified that the Explorer was in the parking lot first when the truck speeded toward it. She testified that the truck was driving more quickly than the Explorer and that when the two vehicles were close to each other the Explorer was forced to stop. After the Explorer stopped, the driver of the truck got out of the truck with a gun and pointed it at the Explorer.. The other witness, Janessa Rhodes, testified that the two cars both drove quickly into the parking lot at the same time, with the truck following the Explorer. She testified that both cars drove around the parking lot, and the Explorer stopped first. The truck then stopped, and at that point two men got out of the truck with guns and began yelling at the occupants of the Explorer.

use of force. The State argues the instruction was properly given because it was based on conflicting evidence that the Davis party's actions at the KFC and in following the Explorer into the Burger King parking lot provoked Valdez's alleged aggression. We agree. Valdez testified that Saunders came up to the Explorer from behind while it was in the drive-through lane at KFC, pressed on the car window, yelled at him to move the car forward, and did not tell him the car was being repossessed or show any repossession paperwork. He testified that Davis's truck blocked the Explorer from passing and that its lights were shining on the Explorer. The defendants demanded that the Explorer's occupants get out of the car. Valdez was "very scared" and quickly drove off. RP 139. Later, Valdez and J.V. noticed the same truck following them into the Burger King parking lot. Spady and Rhodes saw the truck following the Explorer at high speeds into the parking lot. Valdez testified that until he and J.V. were out of the Explorer and Saunders demanded to know where the second car was, he thought he was the victim of a carjacking. The evidence from the victims conflicts with Davis's contention that the defendants did nothing to provoke a belligerent response and was sufficient to justify the initial aggressor instruction.

<u>Rebuttal Evidence</u>

A trial court's decision to permit rebuttal evidence is reviewed for manifest abuse of discretion. <u>State v. White</u>, 74 Wn.2d 386, 395, 444 P.2d 661 (1968). Rebuttal evidence is admitted to allow a plaintiff to answer new matters presented by the defendant. <u>Id.</u> at 394-95. Rebuttal evidence is not admissible where it is

14

No. 68679-8-I/15

unduly prejudicial or on collateral matters. State v. Fisher, 165 Wn.2d 727, 750, 202 P.3d 937 (2009) (internal citations omitted).

The trial court did not abuse its discretion in permitting Cody to testify. Saunders' testimony bolstered the defense's claim that the repossession attempt was conducted reasonably and in accordance with industry standards, and that it was Valdez who acted inappropriately and provoked the need for self-defense.[14] Even when Saunders clarified on cross-examination that he meant some of the practices were standard for his company, his testimony did not fully retreat from his prior testimony and still permitted the inference that his company's practices were consistent with standard industry practice. Cody's testimony rebutted Saunders'

---

[14] Saunders' testimony included the following references to repossession industry standards:

(1) Saunders testified that it was standard in the industry when repossessing more than one car from the same owner to first attempt to repossess the car that the owners were using the most or that was on the move. When asked about this statement during cross-examination, he testified, "Well, with our company, it is [standard], yes." VRP at 451-52.

(2) Saunders testified that when they arrived at the KFC, Davis parked to the side of the drive-through and left enough room for a car to drive by because "[i]n this industry, you know, you can't block people . . . ." VRP at 398. On cross-examination he clarified that not blocking people was standard practice for his company because it did not want to be accused of false imprisonment.

(3) Saunders testified that when they initially pulled into the Burger King parking lot to contact the Explorer it was not his intent to arrest Valdez for attempting to run him down at the KFC. Asked why not, he replied, "It's just not standard in this industry, I guess." VRP at 407.

(4) Saunders testified that after stopping the Explorer in the Burger King parking lot, he told J.V. he was going to ride with Davis while Saunders drove Valdez because "it's standard in the industry, whenever we repossess a vehicle, that – if there's more than two people and there's – You don't want somebody sitting behind you." VRP at 417-18. On cross-examination, when asked about this statement, he testified, "With our company, that's standard, yes." VRP at 452.

(5) During cross-examination the prosecutor asked Saunders whether he was familiar with the term "breach of peace." Saunders testified, "To me it means that -- In the industry anyways, it means that if there's a conflict, then the repossession stops." VRP at 448.

(6) When asked on cross-examination whether it is standard in the industry for a repossession agent to back off when a person shows resistance, Saunders answered that it was, but only at that particular location. He testified he was not aware of anything prohibiting a repossession attempt later.

15

testimony that certain practices were standard in the industry.[15] The defense

introduced evidence that made the rebuttal evidence relevant to the issues, and

the trial court limited rebuttal to matters raised in the defense case.

Davis claims the evidence prejudiced him because it allowed the jury to find

that, by not following repossession protocol, the defendants were the initial

aggressors. "Evidence is not excluded because it is 'prejudicial' but because it is

unfairly prejudicial." State v. Gentry, 125 Wn.2d 570, 637, 888 P.2d 1105, cert.

denied, 516 U.S. 843 (1995) (citing State v. Lord, 117 Wn.2d 829, 891, 822 P.2d

177 (1991)). Here, though the evidence rebutted Saunders' testimony, we do not

agree it was unfairly prejudicial.

<u>Kidnapping To-Convict Instruction</u>

Davis claims the to-convict instruction for the kidnapping counts omitted an

essential element of the crime. In his opening brief, Davis assigns error to the jury

instruction but does not provide argument in support, stating he is joining in his co-

defendant Saunders' appellate brief.[16] But in our recent decision in Saunders'

appeal, we rejected the argument that the to-convict instruction relieved the State

of its burden of proving all of the elements of kidnapping in the second degree

because it did not state that the State had to prove that Saunders knew he did not

---

[15] Cody testified that there were state and federal laws regulating repossession in Washington. He testified it was not industry standard practice to (1) have someone whose car was being repossessed get in the car with the agent; (2) attempt to repossess a car with people in it; (3) use a weapon, abusive language, intimidation, or coercive tactics; or (4) order someone out of a car. He testified that when a first repossession attempt failed, the industry standard was to not make a second attempt within twenty-four hours.

[16] The only briefing Davis provides on this issue appears in his reply brief and pertains to why the jury instruction prejudiced him. We point out that we do not permit litigants to use incorporation by reference as a means to argue on appeal or to escape the page limits for briefs set forth in RAP 10.4(b). Kaplan v. Nw. Mut. Life Ins. Co., 115 Wn. App. 791, 801 n. 5, 65 P.3d 16 (2003).

No. 68679-8-I/17

have legal authority to restrict the victims' movements. <u>Saunders</u>, 2013 WL 5729805, at *2-7 (Oct. 21, 2013). Under <u>Saunders</u>, we reject Davis's claim.

Remanded with instructions to vacate assault counts and for resentencing.

_____Spearman, A.C.J._____

WE CONCUR:

_____Verellen, J._____          _____Cox, J._____

17