IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 79369-1-I |
| Respondent/Cross-Appellant, | |
| v. | DIVISION ONE |
| BROOKS OWEN LAUGHLIN, | UNPUBLISHED OPINION |
| Appellant/Cross-Respondent. | |

CHUN, J. — The State brought numerous charges against Brooks Laughlin for repeatedly abusing his spouse, A.D. A jury found him guilty of three counts of second degree assault, one count of fourth degree assault, two counts of violating a no-contact order (NCO), one count of felony stalking, one count of felony harassment, and one count of misdemeanor harassment. The trial court imposed orders prohibiting Laughlin from contacting A.D. and her family. Laughlin appeals and the State cross-appeals.

We accept the State's concession that we should reverse the conviction for misdemeanor harassment. We also reverse the felony stalking conviction. And we vacate the 25-year NCO. We affirm in all other respects and remand for proceedings consistent with this opinion.

I. BACKGROUND

Laughlin, a law enforcement officer, and A.D. began dating in 2015. They married in June 2016. Throughout their relationship, Laughlin discouraged A.D.

Citations and pin cites are based on the Westlaw online version of the cited material.

from having a relationship with her family. A.D. was close with her family before she met Laughlin, but she did not invite them to the wedding and saw them increasingly less afterwards. Laughlin kept in constant contact with A.D. and tracked her location through her phone.

Laughlin first physically abused A.D. in September 2016 and continued to attack her afterwards. On various occasions, Laughlin strangled her, punched her in the face and head, slammed her head into the side of a bath tub, kicked her, and slapped her. A.D. did not report the abuse. During this time, A.D.'s family and coworkers noticed more than once that A.D. had bruises and swelling on her face. Laughlin also verbally abused A.D. and threatened to commit suicide on multiple occasions.

On February 9, 2018, A.D. went to her parents' house for dinner, which angered Laughlin. He repeatedly texted A.D., insisting that she leave. She left and the two met in a parking lot where Laughlin told A.D. that he wanted to "shoot [her] in the fucking face." This scared A.D., who told her family about this threat. Her family called the sheriff's office. A.D. spoke with the sheriff's office about the threat but omitted some information because she did not want them to arrest Laughlin. A.D. spent the night at her parents' house.

The next day, Laughlin appeared at A.D.'s parents' property. Law enforcement officers arrested him for trespass. Upon Laughlin's release, a Whatcom County District Court judge entered an NCO after considering the information from the incident report. The NCO prohibited Laughlin from contacting A.D. or her family. Despite the NCO, Laughlin and A.D. exchanged

2

texts, called each other, and met in person. Laughlin pushed A.D. to seek to modify the NCO and made threats against her family. Thinking it was the best way to protect her family, A.D. successfully requested modification of the NCO and Laughlin moved back into their house.

A month later, A.D. visited her sick grandmother. Laughlin became furious when she stayed longer than promised. A.D.'s sister worried about her and the next day gave her a book on escaping domestic violence. A.D. showed her sister photographs of her previous injuries and agreed to speak with law enforcement. The two went to the police department and A.D. gave a statement.

The State charged Laughlin with one count of felony stalking; two counts of violation of an NCO; one count of first degree criminal trespass; four counts of felony harassment; four counts of second degree assault; one count of misdemeanor harassment; and three counts of witness tampering.

At trial, the State introduced the testimonies of A.D., her family members, and law enforcement officers. The State also introduced the testimonies of an expert psychologist and an expert on domestic violence. Laughlin testified in his defense.

The jury found Laughlin guilty of one count of felony stalking; two counts of violation of an NCO; one count of felony harassment; three counts of second degree assault; one count of misdemeanor harassment; and one count of fourth degree assault (as a lesser-included offense of second degree assault). The jury found him not guilty as to the remaining counts.

3

Following the verdict, Laughlin moved for arrest of judgment or a new trial for the felony stalking charge. The trial court denied the motion, determining that the evidence sufficed to support finding beyond a reasonable doubt that Laughlin "repeatedly harassed" and "repeatedly followed" A.D.

Laughlin appeals.[1]

## II. ANALYSIS

### A. Dr. Hobart's Testimony

Laughlin says that the trial court erred by admitting Dr. Hobart's expert testimony that Laughlin had acted like a typical domestic violence batterer. The State disagrees and says that Laughlin waived some of his arguments on this issue and that Dr. Hobart's testimony is otherwise admissible. We conclude that Laughlin did waive some of his arguments, and that the trial court did not abuse its discretion in admitting the testimony.

We review a trial court's admission of evidence for abuse of discretion. State v. Arndt, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). "An abuse of discretion occurs when a trial court exercises its discretion in an unreasonable manner or bases it on untenable grounds or reasons." State v. Dennington, 12 Wn. App. 2d 845, 851, 460 P.3d 643, review denied, 196 Wn.2d 1003, 471 P.3d 225 (2020).

---

[1] The State cross appeals, claiming that the trial court abused its discretion by excluding some text messages Laughlin sent to A.D. on February 9, 2018. The State says that the excluded texts were relevant to the felony harassment charge. But because we affirm the felony harassment conviction, we do not address this issue.

1. Waiver

The State says that Laughlin waived his ER 404(a), ER 702, and profile testimony arguments by failing to object to the admission of Dr. Hobart's testimony on those grounds. Laughlin responds that he did object, both in his motion in limine and during trial. We agree with the State.

Generally, we will not consider an error in the admission of evidence if the party did not make a timely objection at trial. Matter of Det. of Belcher, 196 Wn. App. 592, 612, 385 P.3d 174 (2016), aff'd, 189 Wn.2d 280, 399 P.3d 1179 (2017). And "a party may assign error on appeal only on the specific ground of the evidentiary objection made at trial." State v. Scherf, 192 Wn.2d 350, 386, 429 P.3d 776 (2018). Our Supreme Court has "adopt[ed] a strict approach because trial counsel's failure to object to the error robs the court of the opportunity to correct the error." State v. Powell, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). When a court has denied a motion in limine, a party typically need not renew the same objection at trial to preserve the objection. State v. Weber, 159 Wn.2d 252, 271, 149 P.3d 646 (2006). In cases involving evidence that is potentially profile testimony,[2] it is important to object during trial so the court can limit the profiling aspects of the testimony. State v. Avendano-Lopez, 79 Wn. App. 706, 711, 904 P.2d 324 (1995).

---

[2] Profile testimony is testimony showing that a person who possesses certain traits is more likely to commit a crime. State v. Crow, 8 Wn. App. 2d 480, 495, 438 P.3d 541, review denied, 193 Wn.2d 1038, 449 P.3d 664 (2019). The inadmissibility of profile testimony implicates a number of evidentiary rules including Rules 404(a), 402, 403, and 702. Id. at 495–96.

Laughlin did not preserve an objection on profile testimony, ER 404(a), or ER 702[3] grounds. Laughlin moved in limine to limit Dr. Hobart's testimony, but his did not raise these issues.[4] And though Laughlin made a series of objections at trial, none of them were based on profile testimony, ER 404(a), or ER 702.[5]

2. Admissibility of Dr. Hobart's Testimony

Preliminarily, Laughlin concedes on appeal that some of Dr. Hobart's testimony is admissible. Specifically, Laughlin concedes as to these statements: First, victims of abuse often do not leave abusive relationships because they want to make the relationship work, they have lost economic power and agency, they are alienated from support systems, and the abuser prevents them from leaving through physical control or tracking. Second, victims of abuse often do not report the abuse, especially when the abuser is a law enforcement officer because they are skilled at using violence and tracking people and because other law enforcement officers may be loyal to them. Third, a victim of abuse may continue to have contact with their abuser after a court issues an NCO

---

[3] Laughlin does not mention ER 702 in his assignments of error, but he does make an ER 702 argument in his appellate briefing.

[4] Laughlin's motion in limine concerning Dr. Hobart was based on ER 403 and ER 404(b) grounds. The trial court denied the motion. Laughlin preserved those arguments for appeal. Laughlin did mention ER 702 in his motion in limine but it was in the context of saying that Dr. Hobart was not qualified to testify, which is an argument he does not raise on appeal.

[5] Laughlin seemingly contends that his ER 403 objection in his motion in limine preserved a profile testimony argument. See State v. Braham, 67 Wn. App. 930, 935, 841 P.2d 785 (1992) (the specific grounds of an objection may be inferred from context). But nothing in the motion supports such an inference. And "[w]e do not generalize specific objections such that the existence of a pretrial motion to suppress evidence seized preserves *any* claim of error with respect to that evidence." State v. Jones, 163 Wn. App. 354, 365, 266 P.3d 886 (2011). And again, it is particularly important to object to potential profile testimony at trial and Laughlin did not do so. See Avendano-Lopez, 79 Wn. App. at 711.

6

because an NCO is not a "magic shield" and the victim may be trying to prevent an escalation of violence by appeasing the abuser and keeping track of them.

But Laughlin says that most of Dr. Hobart's testimony was inadmissible under ER 404(a), ER 404(b), ER 702, and as profile testimony.[6]  As discussed above, Laughlin waived his ER 404(a), ER 702, and profile testimony arguments.  Thus, we address only his ER 404(b) argument.  The State says that Dr. Hobart's testimony did not violate ER 404(b).  We agree with the State.

Testimony about a defendant's other crimes, wrongs, or acts is not admissible to prove the defendant's character to show that they acted in conformity with that character.  ER 404(b).

An expert on domestic violence, Dr. Hobart testified about the mental state of domestic violence victims.  She did not testify about Laughlin's prior wrongful conduct.  Instead, she explained generally the pattern of domestic abuse, using the "power and control wheel" to illustrate.  The power and control wheel is a visual representation of the ways in which abuse may manifest in a relationship.  It includes isolation; emotional abuse; intimidation; coercion and threats; male privilege; economic abuse; using children; and minimizing, denying, and blaming, all held together by the constant threat of violence.  Dr. Hobart also answered a series of hypothetical questions, based on the facts of this case,

---

[6] Laughlin assigns error to the admission of Dr. Hobart's testimony under ER 403.  Though he preserved an ER 403 argument, Laughlin does not adequately argue an ER 403 claim of error separate from his argument on profile testimony.  See Collins v. Clark County Fire Dist. No. 5, 155 Wn. App. 48, 95–96, 231 P.3d 1211 (2010) ("an appellant's brief must include arguments supporting the issues presented for review and citations to legal authority").  He embeds all mentions of ER 403 or "prejudice" in a profile testimony argument.  Thus, we do not consider any ER 403 argument.

about whether certain behaviors looked like a "hallmark of domestic violence" and about how a victim may be reluctant to leave or report abuse. Because the testimony did not address prior wrongful acts by Laughlin, the trial court acted within its discretion and did not violate ER 404(b) by admitting it.[7]

3. Harmless error

Even assuming the trial court erred in admitting Dr. Hobart's testimony, any error was harmless.

In determining whether a non-constitutional error was harmless, we ask if the outcome of the trial would have been materially different without the error. State v. Braham, 67 Wn. App. 930, 939, 841 P.2d 785 (1992). "Evidentiary errors under ER 404 are not of constitutional magnitude." State v. Chirinos, 161 Wn. App. 844, 851, 255 P.3d 809 (2011) (quoting State v. Jackson, 102 Wn.2d 689, 695, 689 P.2d 76 (1984)). "An error is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" State v. Neal, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001) (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

Laughlin says that, without the contested portion of Dr. Hobart's testimony, his denial of the abuse renders the case inconclusive and that the jury would have been more likely to believe his testimony. But because an abundance of

---

[7] The test to determine the admissibility of ER 404(b) evidence helps demonstrate that none of Dr. Hobart's testimony violated ER 404(b). Among other requirements, "[t]o determine admissibility of evidence under ER 404(b) . . . [t]he court must (1) find by a preponderance of the evidence that the uncharged act probably occurred." State v. Arredondo, 188 Wn.2d 244, 274, 394 P.3d 348 (2017). None of Dr. Hobart's testimony mentioned an uncharged act.

8

evidence supported the convictions of second degree assault, fourth degree assault, and felony harassment,[8] the outcome of the trial would have been the same without the contested portions of Dr. Hobart's testimony.

   a. Assault Convictions[9]

A.D. testified in detail about multiple occasions of violence and abuse by Laughlin. She testified that more than once between September 1, 2016 and December 31, 2016,[10] Laughlin struck and strangled her. She said that the strangling made it difficult to breathe and that the day after being strangled she would have a sore throat and sometimes bruising on her neck or burst blood vessels in her eye. Her mother testified that on October 7, 2016, she saw bruising and a cut near A.D.'s eye. Her mother also testified that she saw

---

[8] Because we reverse the convictions for misdemeanor harassment and felony stalking, we do not address them here. Also, because Laughlin admits to violations of an NCO, we also do not address those convictions here. Below, we address Laughlin's arguments applying the merger doctrine to the NCO convictions.

[9] The jury found Laughlin guilty of three counts of second degree assault, and one count of fourth degree assault. "A person is guilty of assault in the second degree if he . . . (a) [i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm; or . . . (g) [a]ssaults another by strangulation or suffocation." RCW 9A.36.021 (1)(a), (g). Substantial bodily harm is "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110. "'Strangulation' means to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." Id. "A person is guilty of assault in the fourth degree if, under circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another." RCW 9A.36.041(1). The term 'assault' itself is not statutorily defined, so Washington courts apply the common law definition." State v. Stevens, 158 Wn.2d 304, 310, 143 P.3d 817 (2006). There are "three common law definitions of assault: (1) an attempt, with unlawful force, to inflict bodily injury upon another; (2) an unlawful touching with criminal intent; and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is incapable of inflicting that harm." Id. at 310–11.

[10] The charging period for Count IX, second degree assault.

bruising on A.D.'s cheek in November and that when she asked A.D. if Laughlin had done that to her, A.D. "collapsed in my arms . . . weeping."

A.D. testified that between April 1, 2017 and April 30, 2017,[11] Laughlin choked her in front of his children for starting dinner without him. She said this made it difficult for her to breathe. She testified that after the incident, the children would not let anyone start eating without Laughlin present.

A.D. testified that on September 19, 2017,[12] Laughlin grabbed her by the throat and slammed her head into the side of their bathtub until she lost consciousness. She testified that after she regained consciousness she could neither speak nor move. A.D. testified that eventually her mobility returned and as she fled from the tub, he knocked her down and punched her repeatedly, giving her a black eye.

Finally, A.D. testified that in October 2017,[13] she and Laughlin got into a dispute during which he repeatedly insulted her in front of his children. She testified that she told him that it seemed like his life would be "better without" her and went to the kitchen to get a knife. A.D. testified that she did not actually get a knife out. A.D. testified that in response, Laughlin held her by the throat and punched her head in front of one of his children.

Many exhibits admitted into evidence supported the charges. Multiple photographs show bruising and swelling on A.D.'s body and face. Photographs

---

[11] The charging period for Count X, second degree assault.

[12] The charging period for Count XI, second degree assault.

[13] The charging period for Count XII, fourth degree assault.

show holes in the walls of their home resulting from attacks by Laughlin. The trial court admitted a series of remorseful voicemails Laughlin left A.D. after the first NCO was entered.

Expert testimony also supported the charges. An expert psychologist testified that Laughlin displayed signs of personality disorders seen in domestic abusers. And, as discussed above, in the uncontested portions of her testimony, Dr. Hobart said that victims of abuse often do not leave abusive relationships because of a desire to make the relationship work, a loss of economic power and agency, alienation from support systems, and control through electronic tracking. Dr. Hobart also testified that victims of abuse often do not report the abuse, especially when the abuser is a law enforcement officer because they are skilled at using violence and tracking people and because other law enforcement officers may be loyal to them.

Laughlin presented little exculpatory evidence. He testified in his defense, denying that he ever strangled, or threatened A.D. But he admitted that the two fought often and had caused bruises on each other. He testified that on almost every occasion of charged assault, he was protecting A.D. from herself by wresting a knife or a gun away from her. Laughlin said that when he gave A.D. a black eye, it was not because he punched her, but because he had inadvertently struck her eye when he went to push her chest and her head "dipped" down.

Within reasonable probabilities, even without the contested portions of Dr. Hobart's testimony, the outcome of assault charges would not have been materially affected.

   b. Felony harassment conviction[14]

A.D. testified that on February 9, 2018, Laughlin threatened her life. She said that Laughlin was furious at her for having dinner with her parents that night. After receiving a barrage of abusive text messages, A.D. said that she met Laughlin in a parking lot where they spoke from inside their cars. A.D. testified that after a short argument, Laughlin drove away and yelled "die bitch." A.D. testified that Laughlin suggested in his texts that he was going to kill himself, so she told him she was still at the parking lot. She said that when he returned, she walked up to his car and they continued arguing. A.D. testified that she said, "[I]t sure seems like you want to punch me in the face right now" and Laughlin responded, "[N]o, I want to shoot you in the fucking face and then I'll shoot myself in the head and that's what people will read about in the paper. That will be my legacy." A.D. testified that she was afraid he would do so given his skill in quickly drawing his gun.

A.D.'s mother testified that A.D. called her family after the threat and was crying uncontrollably. Her father testified similarly, stating that A.D. told him that Laughlin told her he was going to "shoot her f-ing head off." Her father testified that the family met A.D. at a gas station where she spoke with law enforcement. A.D.'s brother testified that she was extremely upset on her call with him and that she told him that Laughlin had said, "I'm going to shoot you in the fucking face."

---

[14] "A person is guilty of harassment if: (a) Without lawful authority, the person knowingly threatens: (i) To cause bodily injury immediately or in the future to the person threatened or to any other person." RCW 9A.46.020(1)(a)(i). Harassment is a felony if it involves a threat to kill a person. RCW 9A.46.020(2)(b)(ii).

He also testified that she said she was afraid of Laughlin, particularly because he could track her location. A.D.'s brother said that he called the sheriff's office and told them about the threat. A sergeant confirmed this call. The sergeant testified that he met A.D. at the gas station and she was visibly upset. A responding deputy sheriff testified that A.D. was emotional when he spoke with her.

A.D. testified that she told the officers that she was not scared of Laughlin, and that she did so because she did not want them to arrest him that night. Dr. Hobart explained that victims of abuse often do not report the abuse, and that it is even more common when the abuser is a law enforcement officer. Finally, the trial court admitted some of Laughlin's combative and insulting text messages from that night.

Again, Laughlin presented little exculpatory evidence. He denied making any threat against A.D.'s life. He testified that he said that he would rather shoot himself in the face than punch her. Laughlin also testified that he had said "bye bitch," not "die bitch." Laughlin stated that it is difficult to draw his gun while in his car to contend that A.D.'s fear was not reasonable.

Within reasonable probabilities, even without the contested portions of Dr. Hobart's testimony, the outcome of the felony harassment charge would not have been materially affected.

B. Alternative Means Crimes

Laughlin says that the State failed to prove each alternative means for the felony stalking, second degree assault, and misdemeanor harassment convictions beyond a reasonable doubt and thus that we must reverse the

convictions. We disagree with him as to the second degree assault convictions. But we agree with him as to the felony stalking conviction and the misdemeanor harassment conviction; and the States concedes as to the latter.

If insufficient evidence supports each alternative means of an alternative means crime, a particularized expression of jury unanimity is required for a conviction. State v. Owens, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014), State v. Woodlyn, 188 Wn.2d 157, 163–64, 392 P.3d 1062 (2017). But if sufficient evidence supports each alternative means, the defendant cannot insist on unanimity for each means. Woodlyn, 188 Wn.2d at 163–64. When the court does not instruct the jury that it must be unanimous as to the means used to convict an alternative means crime, sufficient evidence must support each alternative means. Owens, 180 Wn.2d at 99. Sufficient evidence is evidence that, when viewed in the light most favorable to the State, supports a rational jury finding all the essential elements of the crime beyond a reasonable doubt. State v. Armstrong, 188 Wn.2d 333, 341, 394 P.3d 373 (2017).

1. Second degree assault

Laughlin says that insufficient evidence supports the jury's finding that he inflicted substantial bodily harm on A.D. for purposes of Counts IX and X for second degree assault. We disagree.

Second degree assault is an alternative means crime. State v. Smith, 159 Wn.2d 778, 784, 154 P.3d 873 (2007). The trial court instructed the jury that, to convict Laughlin of second degree assault, it must find that Laughlin assaulted A.D. by strangulation *or* by inflicting substantial bodily harm.

14

RCW 9A.36.021(1)(a), (g).  Substantial bodily harm is defined as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part."  RCW 9A.04.110.  Laughlin says that insufficient evidence supports a finding that he inflicted substantial bodily harm on A.D. for Counts IX and X.

The charging period for Count IX included an incident on October 6, 2016, when Laughlin strangled A.D.  A.D. testified that she could not breathe or scream during the incident, and the next day she had bruising and swelling around the eyes.  The charging period for Count IX also included multiple attacks during November 2016, during which Laughlin strangled A.D., who suffered bruising as a result.  A.D. stated that the bruising was unlike bruising she had seen before and took pictures to document them.  Count X concerned an incident on April 29, 2017 where Laughlin strangled A.D. for beginning dinner without him.  She testified that it was hard to breathe.

A finding of substantial bodily harm may stem from bruising because it is a temporary but substantial disfigurement.  See State v. Ashcraft, 71 Wn. App. 444, 455, 859 P.2d 60 (1993) (bruising from being beat with a shoe is substantial bodily harm); State v. Hovig, 149 Wn. App. 1, 13, 202 P.3d 318 (2009) (a bite-shaped bruise on a child's cheek that could last for 1–2 weeks is substantial bodily harm).  Also, not being able to breathe or scream is a temporary but substantial impairment of a bodily part or organ.  Thus, sufficient evidence

supports the alternative means of infliction of substantial bodily harm for purposes of the second degree assault convictions.

2. Felony stalking

Laughlin says that insufficient evidence supports a finding that he "repeatedly followed" A.D. for purposes of the felony stalking conviction because Laughlin did not maintain "physical or visual proximity" to A.D. The State counters that Laughlin may not challenge the sufficiency of the evidence based on a definition that the court did not give to the jury. It also says that sufficient evidence supports a finding that Laughlin "repeatedly followed" A.D. We agree with Laughlin.

Felony stalking is an alternative means crime. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). The trial court instructed the jury that the crime of felony stalking requires that the defendant "intentionally and repeatedly harass[] or," alternatively, "repeatedly follow[]" another person. RCW 9A.46.110. RCW 9A.46.110 defines "follows" as "maintaining visual or physical proximity." See also State v. Ainslie, 103 Wn. App. 1, 7, 11 P.3d 318 (2000) (holding that the defendant "followed" the victim when he "repeatedly parked within sight" of her). The court did not instruct the jury on the statutory definition of "follows." But "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

16

The evidence does not suffice for the jury to find that Laughlin "repeatedly follow[ed]" A.D. The State presented evidence that Laughlin (1) tracked A.D. on her phone's GPS system, (2) knew how long she stayed at the hospital with her sick grandmother, (3) knew when she was at her parents' house, and (4) urged her to turn the GPS on when she had it switched off. The State contends that electronic tracking constitutes maintaining visual or physical proximity. But the State does not cite—nor have we found—any legal authority or dictionary definition supporting this interpretation. We thus conclude that the State did not prove beyond a reasonable doubt that Laughlin maintained visual or physical proximity to A.D.

3. Misdemeanor harassment

Laughlin says that the evidence does not suffice to support findings for two of the alternative means for misdemeanor harassment. The State concedes this issue. We agree with the parties.

Misdemeanor harassment is an alternative means crime. State v. Morales, 174 Wn. App. 370, 377, 298 P.3d 791 (2013). The trial court instructed the jury that to convict Laughlin for misdemeanor harassment, it must find that, between January 1, 2017 and March 30, 2018, Laughlin threatened to (1) cause bodily injury to A.D., (2) cause physical damage to A.D.'s property, (3) subject A.D. to physical confinement or restraint, or (4) harm A.D.'s health or safety. See RCW 9A.46.020. As the State concedes, the record contains insufficient evidence for a rational jury to find that Laughlin threatened to damage A.D.'s

property or to subject her to physical confinement or restraint during the relevant period.

C. Merger

Laughlin says that his convictions for one count of misdemeanor harassment and two counts of misdemeanor violation of an NCO merge into his conviction for felony stalking and must be reversed. Contending that the felony stalking conviction should be affirmed, the State concedes that the convictions for violation of an NCO should be reversed; it does not address the harassment conviction, as it believes it should be reversed on the grounds discussed just above. Because we reverse the felony stalking conviction, we conclude no double jeopardy violation exists and uphold the convictions for violation of an NCO. And because we have concluded that the misdemeanor harassment conviction should be reversed on the grounds discussed above, we do not address it here.

Federal and state constitutional double jeopardy protections prevent multiple punishments for the same offense. State v. Vladovic, 99 Wn.2d 413, 422, 662 P.2d 853 (1983); State v. Davis, 177 Wn. App. 454, 460, 311 P.3d 1278 (2013); CONST. art. I, § 9; U.S. CONST. amend V. Absent a clear legislative intent to permit punishment of multiple offenses, if a jury convicts the defendant on greater and lesser-included offenses, the lesser offenses merge into the greater and must be vacated on remand. State v. Turner, 169 Wn.2d 448, 459, 238 P.3d 461 (2010); In re Pers. Restraint of Strandy, 171 Wn.2d 817, 819–20, 256 P.3d 1159 (2011).

We review de novo issues involving merger. Davis, 177 Wn. App. at 460.

Proving a violation of an NCO can elevate a stalking charge to a felony. RCW 9A.46.110(1), (5)(b)(ii). Thus, the felony stalking conviction is the greater offense and the NCO violations are the lesser-included offenses. Because we reverse Laughlin's felony stalking conviction, there is no longer a double jeopardy issue.

D. Sentencing

Laughlin says that, under State v. Warren, the NCOs prohibiting him from contacting A.D. and her family can last no longer than 10 years because that is the statutory maximum for his most serious crimes of second degree assault. 165 Wn.2d 17, 32, 195 P.3d 940 (2008). The State responds that, under State v. Weller, because the trial court imposed an exceptional sentence and ran Laughlin's sentences to Counts X and XI consecutively, it did not exceed its authority. 197 Wn. App. 731, 735, 391 P.3d 527 (2017). We conclude that the 11-year NCO between Laughlin and A.D.'s family does not exceed the maximum allowable exceptional sentence; but the 25-year NCO between him and A.D. does so exceed.

Generally, we review the imposition of crime-related prohibitions for abuse of discretion. State v. Riley, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993). But if the question is whether the trial court exceeded its authority in imposing a crime-related prohibition, we review de novo. Weller, 197 Wn. App. at 734.

A trial court may impose a crime-related prohibition such as an NCO for a period up to the statutory maximum for the crime. Warren, 165 Wn.2d at 32;

19

former RCW 9.94A.505(8) (2010).  If, however, the trial court imposes an exceptional sentence and runs multiple sentences consecutively, the crime-related prohibition can last for a period equaling the "sum total" of the exceptional sentence.[15]  Weller, 197 Wn. App. at 735.

The trial court exceeded the statutory maximum when it imposed the NCOs.  Counts X and XI for second degree assault are class B felonies with a 10-year statutory maximum.  RCW 9A.36.021, RCW 9A.20.021(b).  During sentencing, the trial court imposed an 11-year NCO between Laughlin and A.D.'s family and a 25-year NCO between him and A.D.  Laughlin says the trial court exceeded its authority in imposing these NCOs.

Because the trial court imposed exceptional sentences for Counts X and XI, the trial court could impose NCOs for up to 20 years.  Here, the trial court ran Counts X and XI consecutively for community custody purposes.[16]  As each count had a statutory maximum of 10 years, the maximum allowable exceptional sentence is 20 years.  Thus, the trial court did not exceed its authority in imposing the 11-year NCO between Laughlin and A.D.'s family, but it did so exceed its authority in imposing a 25-year NCO between Laughlin and A.D.[17]

---

[15] In Weller, one of the defendants was charged with four counts of second degree assault (10 year maximum) and one count of unlawful imprisonment (5 year maximum), and all five counts ran consecutively.  197 Wn. App. at 735.  Thus, the court held that the trial court did not exceed its authority by imposing an NCO of 45 years.  Id.

[16] Laughlin says that Weller does not apply because it involved a consecutive sentence of confinement, not a consecutive sentence of community custody.  But he cites no legal authority to support such a distinction and there appears to be none.

[17] The State says that one of Laughlin's other convictions can be tacked on to boost the NCO from 20 to 25 years.  This misapplies Weller because none of the sentences for the other convictions ran consecutively with Counts X and XI and therefore cannot be used to increase the length of the NCO.

### III.  CONCLUSION

Given the foregoing, we reverse the convictions for misdemeanor harassment and felony stalking.  And we vacate the 25-year NCO.  We affirm in all other respects and remand for proceedings consistent with this opinion.

_____
Chun, J.

WE CONCUR:

_____        _____
Mann, C.J.                                                  Dwyer, J.