**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientslawareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83773-7-I |
| Respondent, | |
| v. | DIVISION ONE |
| ALFONSO AGUILAR, | PUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — Alfonso Aguilar broke into his ex-girlfriend A.B.'s[1] apartment while she was at work and, when she returned, he embarked on an overnight binge of emotional, physical, and sexual violence. Aguilar left her apartment in the morning's early hours, forcing A.B. to accompany him and used her bank card to withdraw money from an ATM, drove across town, purchased drugs, used them on himself, and attempted to force them on her before she managed to escape.

Aguilar was charged and convicted of first degree burglary, first degree kidnapping, first degree rape, second degree assault, and first degree robbery. The first degree offenses were elevated by instructing the jury on multiple alternative means. The jury's verdict form, however, did not require it to specify the means it relied on to elevate offenses.

Aguilar appeals.

---

[1] We use the victim's initials to protect her privacy and dignity. RCW 7.69.010.

He challenges the State's alternative means instructions, contending that some alternatives were not proven, a violation of his right to a unanimous jury verdict. Aguilar additionally contends that his right to a unanimous jury was violated because the State submitted evidence that two acts of rape occurred, but did not require the jury to agree on which act supported its conviction. We agree with both of these assertions. However, we reject his remaining contentions that there was a violation of double jeopardy and that some of the convictions involve the same criminal conduct.

FACTS

Alfonso Aguilar and A.B. met in high school and began dating. They remained together for 17 years, living together for most of that time, and moved from out of state to the Seattle area in 2012. Aguilar was periodically unemployed and relied on A.B. to pay bills. Their relationship was volatile, and Aguilar was sometimes violent.

Shortly before they moved to Seattle, Aguilar was injured in a car accident. A.B. gradually began to suspect that Aguilar had developed an addiction to prescription painkillers, and eventually realized that he was also purchasing pills illegally. He was often absent and she started smelling a chemical odor on him. He later admitted that he was using heroin. A.B.'s efforts to find Aguilar effective addiction treatment were not fruitful.

A.B. expressed to Aguilar that she wanted to split up. But she did not feel she was able to move out herself until after her two special needs dogs died.

2

After they passed, she found an apartment for herself in April 2018, in Ballard.  In the final months of their shared lease, Aguilar's drug use worsened and A.B. started finding used needles and other drug paraphernalia around the apartment. When their lease ended, Aguilar lived in his car.  Many of his belongings remained with A.B.

The two stayed in touch, texting from time to time.  A.B. continued attempting to find resources for Aguilar, but did not, at first, tell him where she now resided.  He began asking her for water, food, and other "basic human needs," and she would meet him outside her apartment to provide those items. He eventually disclosed that he knew where her apartment was, though she was unsure if he was telling the truth.  She did, however, spot him in the neighborhood on a few occasions, and once had a tense interaction with him in a grocery store.

A.B. reached out to Aguilar's family, who arranged for him to visit Colorado in the summer of 2018 to get help for his drug issues.  In preparation for his flight, she allowed him to shower in her apartment and sleep on the couch, and she helped him sell his car.  She then drove him to the airport.

Aguilar's stay in rehab was shorter than planned, but A.B. and Aguilar began texting and talking on the phone more regularly while he was in Colorado. Sometimes their talk was friendly or pleasant.  But Aguilar's behavior also became, in A.B.'s words, "more erratic," alternating between fixating on their past relationship and verbally attacking her for abandoning him.  He began to threaten

suicide.

Sometime in August 2018, Aguilar returned to Seattle. He stayed in a hotel in Lynwood, and, on one occasion, he and A.B. saw each other and were intimate. A.B. regretted it and told him that she "couldn't be with him again." On one day in mid-August, she allowed him back into her apartment to shower. He became irate when he saw that she had kept a painting he owned; he destroyed it and began yelling.

Text logs admitted at trial demonstrate a worsening dynamic over the course of August and early September. Aguilar would repeatedly reach out to A.B., vacillating between declarations of love, tirades, and expressions of self-pity. A.B. would ignore some of these messages but then respond, typically with requests that Aguilar stop trying to communicate with her, though also with well wishes and regrets. His messages began to fixate on her dating life. They took on an ever more threatening tone, indicating that he was observing her and saying things like, "Keep testing me im [sic] right around the corner and give zero fucks anymore." And they implied that he was suicidal: "just be real for fucking once since it will ve [sic] the last time we speak." Several times, he showed up unannounced at her apartment. At various points, she responded by emphasizing that she felt unsafe around him, telling him to stay away.

The two exchanged a series of escalating messages on the day of Aguilar's offenses—and the day he was meant to report to jail to serve time in an unrelated case—September 11, 2018. Aguilar reached out in the morning,

4

asking to talk. A.B. waited until the afternoon to respond, saying "you are in no place to have a rational conversation, and have made me feel completely unsafe around you. that [sic] is the real reason I'm not speaking to you. . . . I did promise we'd be friends but that gets taken away when you act the way you have been." Aguilar responded angrily with a series of long, meandering missives accusing her of betraying him. A.B. engaged to ask for clarification, to deny that what he believed he had seen—another man in her car—had in fact occurred, and to indicate that she would block his number. Aguilar continued lashing out: "im [sic] so tired of the abuse you sicken me as a person now and I don't know or recognize anything about you anymore goodbye baby I always loved you and cared and would have done anything for you my love goodbye forever."

Aguilar's last message to A.B. was sent at 7:20 p.m., and cuts off in the middle of a thought. According to her testimony, this is because he sent it, unfinished, the moment she entered her apartment after returning from work. Aguilar was already inside. A.B. is unsure how he entered; she testified that he indicated he picked the lock, but she thinks he might have simply crawled through a window. Regardless, she testified that armed with a metal baseball bat, he rushed out of the bedroom and shoved her against the wall. He maneuvered her onto her couch, and began "a barrage of name calling and . . . swearing." He told her that he intended to kill himself in front of her. A.B. noticed that her apartment was "completely torn apart." Underwear and other items from her personal drawers were all about. Cotton stuffing from a replica of her dog

was strewn around, the animal's head torn off. Photos taken by law enforcement match this description.

Aguilar took A.B.'s phone, demanded the password, and, seeing that she had dating apps downloaded, punched her in the side of the head. Then, with the baseball bat, he struck her several times on her side, hand, and legs. He yelled angrily throughout, often using sexually demeaning terms.

He eventually ordered her to take off her pants and "sprayed [a bottle of lubricant] on [A.B.] and the couch and the blinds." Still verbally demeaning and threatening her, he alternated between raping her and, having grabbed one of her kitchen knives, stabbing the furniture and walls, including the couch cushions next to A.B.

After some time, he became distracted, tried to make her drink some wine, which she pretended to do, searched for drugs, used drugs, and then brought her into the bedroom. There, he forced himself on her again. In the process he choked her, "clawed" at her breasts, repeatedly slapped her, and punched her in the stomach. Forensic evidence later matched a vaginal swab with Aguilar's DNA.[2]

Aguilar had A.B. make him a sandwich as a "last meal." Compelling A.B. into her car by knifepoint, he drove her to a nearby 7-11 convenience store and used her bank card to withdraw cash. A.B. recalled leaving the store at around 1:49 a.m. Aguilar then drove them south past downtown, stopping so he could

---

[2] Deoxyribonucleic acid.

purchase heroin. He threatened her with death if she attempted to escape, and continued to scream at her and strike her.

Aguilar found a place to park near Airport Way, where they would remain through the rest of the night as he used drugs, continued to verbally and physically assault A.B., and drift in and out of sleep. Once he had parked, Aguilar used heroin and began to nod off. When the car's battery died, he led A.B. to a nearby motorhome, whose occupants he apparently knew. After he talked with them and purchased methamphetamine, he threatened A.B. that he might allow them to rape her and they returned again to the car, where he tried unsuccessfully to make her use drugs. He continued to alternately doze and scream at and attack her.

Sometime after sunrise, Aguilar took steps to inject A.B. with heroin, putting a tourniquet on her arm. Concerned that the result might be fatal, A.B. took her chances and ran. She made it to a nearby building, knocked on the door, and screamed for help. Aguilar caught up with A.B. and pepper sprayed her but then ran, apparently at the sight of two men inside. The police arrived shortly afterward. Body camera footage of A.B.'s initial report matches the testimony she gave at trial.

Aguilar was charged with first degree rape, first degree burglary, first degree robbery, second degree assault, and first degree kidnapping. The State also charged deadly weapon enhancements, intimate partner enhancements, and sexual motivation enhancements.

7

At trial, Aguilar's defense consisted of a general denial. In the words of his counsel at closing argument: "Folks, Al didn't do it. He did not commit burglary. He did not commit rape. He didn't rob [A.B.] He didn't kidnap her. There was not assault in the second degree." Aguilar did not deny drug use, his presence in A.B.'s apartment, or that they had had sexual relations. Instead, he told a story that was minimally consistent with the physical evidence and presented the case as a credibility contest between him and A.B.

Aguilar testified that though their relationship had been rocky, he and A.B. had been reestablishing communication. He interpreted the text messages they had exchanged on September 11 as discussing "possibly meeting up or talking later in the evening about it more," saying that they reflected a hot and cold dynamic consistent with the history of their relationship. He testified that he waited for A.B. outside her apartment, where he had met her when she returned home. In his telling, she invited him in and their discussion transformed from a quarrel into consensual sex that began on the couch and migrated to the bedroom. He admitted their intercourse included his "hands on her neck," but asserted that she consented. He explained the apartment's condition as having been caused when they quarreled again after having sex and destroyed each other's possessions out of anger. Once they had cooled down, he testified, she agreed to loan him cash to pay for drugs. However, he denied that he had assaulted her until late in the evening, after they had left her apartment, when he testified that she insulted him and he snapped, striking her with his fists and steel

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

toed boots, which explained her physical injuries. He correspondingly asked the jury to find him guilty of assault in the fourth degree but acquit on the other charges.

The jury found Aguilar guilty of the crimes charged. It also found that the State had proven its deadly weapon enhancements for all crimes but robbery, and its intimate partner enhancements for all crimes. It did not return a verdict on whether he had committed the crimes with sexual motivation. Nor, because the verdict forms were general, did the jury indicate what violent act it considered assault. And though it was instructed that it could rely on any of a number of means to elevate each of the charged crimes, the verdict forms did not provide the jury with a means to specify the specific basis for elevating the charges.

Aguilar received an indeterminate life sentence with a minimum of 314 months, which he appeals.

ANALYSIS

Aguilar raises four issues on appeal. The first two concern his right to a unanimous jury verdict. He contends that this right was violated (1) because some of the bases on which the jury was instructed it could elevate his rape and robbery convictions to the first degree were not supported by substantial evidence, and (2) because multiple acts of sexual intercourse occurred and it is unclear which the jury relied on to find him guilty of rape.

We agree that the State failed to prove one of the alternative means that might have elevated his rape charge: that A.B. was "situated" in the apartment at

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the time of Aguilar's felonious entry. Aguilar is also correct that the two acts that might have supported his rape charge—intercourse on the couch and an uncertain time later in the bedroom—were not one continuous course of conduct, and we cannot conclude beyond a reasonable doubt that the jury would have found him guilty of both. We therefore vacate his rape offense and its related enhancements.

Because we vacate his rape offense, we also vacate his kidnapping offense. One of the means by which the jury could elevate kidnapping to the first degree was that Aguilar committed it with intent to facilitate rape. Because the rape and kidnapping charges are factually intertwined, it is no longer appropriate to conclude that the jury determined Aguilar had such an intent.

We agree with Aguilar that the State failed to prove one of the alternative means that might have elevated his robbery charge: that he inflicted bodily injury in the course of the crime. We vacate this conviction but remand for resentencing on the lesser included offense of second degree robbery because the jury was properly instructed on it and the State proved its elements.

Our resolution of the jury unanimity issues informs our resolution of Aguilar's remaining challenges. In the event that we reject his jury unanimity arguments, Aguilar contends that double jeopardy prohibits his punishment for first degree rape and elevating offenses of assault and kidnapping or, alternatively, that he may not be convicted of kidnapping and its elevating offense of assault. With his rape and kidnapping convictions gone, we need not address

10

his related double jeopardy arguments.

Finally, Aguilar asserts that his burglary, assault, and rape convictions are the same criminal conduct and should not have all counted towards his offender score during sentencing. We disagree. Aguilar's same criminal conduct argument now concerns only burglary and assault, the first of which was complete by the time the second occurred.

<u>Jury Unanimity Concerning Alternative Means</u>

Aguilar first contends that his right to a unanimous jury decision was violated because the jury was instructed on numerous means to elevate his rape and robbery offenses to the first degree but sufficient evidence did not support each of those means. Aguilar is correct. The first degree rape statute requires the victim to be "situated" in the building or vehicle feloniously entered, but A.B. was not in her apartment when Aguilar broke in. RCW 9A.44.040(1)(d). Robbery, on the other hand, can be elevated to the first degree by the infliction of bodily injury. RCW 9A.56.200(1)(a)(iii). But though Aguilar certainly injured A.B., he did not do so during the robbery itself, which was his use of A.B.'s bank card to withdraw money from an ATM.

Our state constitution protects a criminal defendant's right to be convicted only by a unanimous jury. <u>State v. Armstrong</u>, 188 Wn.2d 333, 340, 394 P.3d 373 (2017); WASH. CONST. art. I, § 21. Usually, the right to a unanimous verdict is straightforwardly applied: the jury must agree that the State proved each element of a crime beyond a reasonable doubt. <u>State v. Montano</u>, 169 Wn.2d

11

No. 83773-7-I/12

872, 877, 239 P.3d 360 (2010).

A variety of offenses is known as "alternative means" crimes. Often, the State may attempt to elevate an offense to a higher degree by presenting evidence to the jury of one or more conditions present in addition to the essential elements of the crime. Murder in the second degree, for example, can be elevated to the first degree if the perpetrator also committed certain other felonies, such as rape or robbery, in the course of the murder. RCW 9A.32.030(1)(c). If the State presents the jury with more than one of these factors as a means to elevate the offense's degree, it is an "alternative means" case. Armstrong, 188 Wn.2d at 340.

The constitutional right to jury unanimity functions uniquely in the alternative means context. When more than one means of elevating the degree of a crime is present, the State may instruct the jury on each of the means that is potentially available. Armstrong, 188 Wn.2d at 340. So long as each means is supported by sufficient evidence, the jury does not need to be unanimous as to *which* means it relies on to elevate the crime to a higher degree. Armstrong, 188 Wn.2d at 340. But, under the Washington constitution, if even a single one of the alternative means on which the jury is instructed is unsupported by sufficient evidence, the conviction will not be affirmed. State v. Sandholm, 184 Wn.2d 726, 732, 364 P.3d 87 (2015).[3]

_____

[3] This standard is more protective than the federal constitution's jury unanimity right, which requires only that *one* of the alternative means be supported by sufficient evidence. State v. Owens, 180 Wn.2d 90, 95 n.2, 323 P.3d 1030 (2014). The State points to a recent concurrence in State v. Barboza-

12

No. 83773-7-I/13

"Evidence is sufficient if, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found" the elements contested beyond a reasonable doubt. State v. Owens, 180 Wn.2d 90, 99, 323 P.3d 1030 (2014). Constitutional in nature, jury unanimity concerns are reviewed de novo. Armstrong, 188 Wn.2d at 339. They may be raised for the first time on appeal under the manifest constitutional error standard. RAP 2.5(a).

Aguilar's first degree rape and first degree robbery convictions were alternative means crimes because each was potentially elevated by one of several means. He asserts that at least one of the alternative means on which the jury was instructed for each offense was unsupported by sufficient evidence. Because we view the evidence in the light most favorable to the State, we assume the truth of A.B.'s testimony for the purposes of this analysis.

1. Elevation to First Degree Rape

Second degree rape exists in a number of forms. RCW 9A.44.050. The form relevant in this case requires proof that (1) sexual intercourse occurred (2) by forcible compulsion. RCW 9A.44.050(1)(a). "Sexual intercourse" is defined to have "its ordinary meaning, and occurs upon any penetration, however slight," but also includes "any penetration of the vagina or anus however slight, by an object, when committed on one person by another." RCW 9A.44.010(14). Four alternative means may elevate second degree rape to first degree rape: if

---

Cortes, 194 Wn.2d 639, 649-50, 451 P.3d 707 (2019) (JJ. Gonzalez and Owens, concurring) arguing for state adoption of the federal standard in an attempt to preserve the issue for a possible appeal of our decision.

13

the perpetrator

> (a) Uses or threatens to use a deadly weapon or what appears to be a deadly weapon; or

> (b) Kidnaps the victim; or

> (c) Inflicts serious physical injury, including but not limited to physical injury which renders the victim unconscious; or

> (d) Feloniously enters into the building or vehicle where the victim is situated.

RCW 9A.44.040(1). The jury here was instructed on each of these four alternative means. As a result, for Aguilar's first degree rape conviction to be affirmed, each must be supported by sufficient evidence. He contends that the third and fourth were unsupported, though we decide this issue only through analysis of the fourth, the felonious entry means.

Aguilar's strongest argument, with which we agree, is that A.B. was not "situated" within her apartment at the time of his felonious entry because she was not present at the time of his entry,[4] arriving only after it was complete. "Situated" is not statutorily defined. The question here is whether "situated," as used in RCW 9A.44.040(1)(d), requires the victim to be physically present in the building or vehicle into which the perpetrator feloniously enters at the time of the entry. Or whether, in the alternative, "situated" might have some broader meaning such as "resides" or "is habitually present."

We interpret the meaning of statutory language de novo. <u>Perkins Coie v.</u>

---

[4] That A.B. was not present is uncontested for the purposes of this argument, as it must be, because we view the evidence in the light most favorable to the State, and so do not consider Aguilar's testimony that A.B. let him in.

14

Williams, 84 Wn. App. 733, 736, 929 P.2d 1215 (1997).  We attempt to "derive

legislative intent solely from the plain language . . . in which the provision is

found, related provisions, and the statutory scheme as a whole."  State v. Evans,

177 Wn.2d 186, 192, 298 P.3d 724 (2013).  We routinely look to dictionary for

guidance on the plain meanings of words.  See, e.g., State v. Lounsbery, 74

Wn.2d 659, 663, 445 P.2d 1017 (1968) (looking to Webster's Third International

Dictionary (1964) to define "parent").  Only if language is ambiguous do we

engage in statutory construction, attempting to discern the legislature's intent by

looking to legislative history.  Evans, 177 Wn.2d at 192-93.

      We hold that the plain language of "is situated" unambiguously means "is

physically present at the time of the felonious entry" for the purposes of RCW

9A.44.040(1)(d).  Webster's defines "situated" as "having a site, situation, or

location: located."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2129 (10th

ed. 2002).  Use of "located" supports reading "situated" to mean "physically

present," particularly in combination with the use of the present tense "is

situated."

      This understanding of "situated" is strengthened by looking to the slightly

broader context of RCW 9A.44.040(1)(d): "Feloniously enters into the building or

vehicle where the victim is situated."  The legislature's use of "building" as

opposed to "home," and its reference to vehicles, decouples the meaning of the

statute from a pure concern for felonious entry into a residence, opening up the

possibility that a rape charge may be elevated on the basis of burglary at, for

15

example, a workplace. This means that we cannot read "situated" as "resides."

Still, the State contends that even when the victim was not present at the time of the felonious entry, RCW 9A.44.040(1)(d) is satisfied if the perpetrator remains until the victim arrives. We disagree. This reading is contradicted by the use of the present tense "is" situated. And as Aguilar argues, understanding RCW 9A.44.040(1)(d) in this way would render its meaning: "feloniously enters the building where the rape occurred," essentially eliminating "situated" from the statute altogether. This is too far afield from the statute's actual language.[5]

The State therefore failed to provide sufficient evidence to support the felonious entry prong. The evidence did not indicate that A.B. was present at the time of Aguilar's entry. Aguilar's first degree rape conviction violates his right to a unanimous jury verdict as a result. Because we conclude that at least one of the alternative means presented to the jury is not supported by sufficient evidence, we do not address Aguilar's argument that another means—"inflicts serious physical injury," the elevating means of RCW 9A.44.040(1)(c)—was also unsupported.

2. Elevation to First Degree Robbery

A person commits second degree robbery if they "unlawfully take[] personal property from the person of another or in [their] presence against [their] will by the use or threatened use of immediate force, violence, or fear of injury to that person or [their] property or their person or property of anyone." RCW

---

[5] Because we conclude that the term is unambiguous, we do not address the State's arguments about legislative intent.

9A.56.190 (defining robbery); RCW 9A.56.210 (defining second degree robbery

as the commission of robbery). Robbery may be elevated to the first degree if:

> (a) In the commission of a robbery or of immediate flight
> therefrom, [the perpetrator]:
>
> (i) Is armed with a deadly weapon; or
>
> (ii) Displays what appears to be a firearm or other deadly
> weapon; or
>
> (iii) Inflicts bodily injury.

RCW 9A.56.200(1). The jury was instructed on all three of these alternative

means. Aguilar challenges whether sufficient evidence supported the third

possibility: infliction of bodily injury in the commission of or immediate flight from

the robbery. We agree that sufficient evidence did not demonstrate that Aguilar

inflicted bodily injury on A.B. during the commission of the robbery or during the

immediate flight therefrom.

The robbery with which Aguilar was charged was his theft of A.B.'s "bank

card and money."[6] A.B. testified that after he raped her, Aguilar began to tear

posters off the wall and otherwise attack objects that reminded him of their

relationship. During and after that process, Aguilar answered a phone call, A.B.

got dressed and used the bathroom, and Aguilar told A.B. to make him a

sandwich "as his last meal." Eventually, Aguilar decided that they would leave

the apartment and complete a plan he had articulated at some earlier point: he

---

[6] On appeal, the State argues the infliction of bodily injury alternative means is supported based on the injuries Aguilar inflicted in A.B.'s apartment, because certain evidence "established that he unlawfully took personal property from [A.B.] while he was in her apartment." However, the State never charged robbery based on this conduct.

17

would take her money, buy drugs, and overdose. Armed with a knife and bat, Aguilar had A.B. get into her car and he drove them to a nearby 7-11 convenience store. He had A.B. use the 7-11's ATM to withdraw $200, threatening that otherwise he would "spill out [her] intestines." A.B.'s attempt to solicit help from the 7-11's clerk by mouthing "help" was unsuccessful, and the two left the store without incident. They then drove from Ballard to the "south side of town," where Aguilar purchased what A.B. believed to be heroin.

A.B. did not testify that Aguilar physically injured her between the time he raped her and the time he purchased drugs. Instead, he accomplished his robbery through the threat of force, a threat legitimized by his demonstrated willingness to be violent. And in fact, the State's closing argument at trial focused on the coercive effect of the already-inflicted harm in explaining how he accomplished his robbery.

We therefore agree with Aguilar that sufficient evidence does not support the third alternative means by which the jury was instructed that it could find him guilty of first degree robbery: the infliction of serious bodily injury. Aguilar doubtless inflicted injuries on A.B., but he did so before and after the charged robbery, not during its commission or the immediate flight therefrom. The State asks us to consider injuries inflicted before and after the robbery occurred. We decline to do so. Aguilar's first degree robbery conviction violates his right to a unanimous jury verdict as a result.

<u>Jury Unanimity Concerning Multiple Acts</u>

18

No. 83773-7-I/19

Aguilar makes another argument under his right to a unanimous jury. This time, he asserts that testimony described two distinct instances of rape—his sexual assault of A.B. on the couch, and the later sexual intercourse in the bedroom—but the jury was not instructed that it had to unanimously agree as to *which* act constituted his single charged rape offense, constituting error. Aguilar further argues that this error is not harmless beyond a reasonable doubt. We agree and conclude that his rape conviction cannot stand.

The constitutional right to a unanimous jury verdict speaks to the validity of convictions in "multiple acts" cases. State v. Carson, 184 Wn.2d 207, 227, 357 P.3d 1064 (2015). These are cases in which "the prosecution presents evidence of several acts that could form the basis of one count charged." State v. Kitchen, 110 Wn.2d 403, 409, 756 P.2d 105 (1988). To avoid error and ensure jury unanimity in a multiple acts case, one of two things must occur: either (1) the State may tell the jury on what act to rely in its deliberations, or (2) the court may instruct the jury that it must unanimously rely on a specific criminal act to support its conviction. Kitchen, 110 Wn.2d at 411. The former is known as "election," the latter is known as giving a "Petrich"[7] instruction, after the case in which the instruction originated. Kitchen, 110 Wn.2d at 411 ("election"); Carson, 184 Wn.2d at 216-17 ("Petrich instruction"). To avoid constitutional error, any election must " 'clearly identif[y]' " the act on which the charge in question is based. Carson, 184 Wn.2d at 228-29 (quoting State v. Thompson, 169 Wn. App.

---

[7] State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984).

19

436, 474-75, 290 P.3d 996 (2012)).

Whether a unanimity instruction was required is reviewed de novo. State v. Boyd, 137 Wn. App. 910, 922, 155 P.3d 188 (2007). A constitutional error occurs in a multiple acts case in which no Petrich instruction was given and no election was made, but reversal is not warranted if the error was harmless, a standard we will address in more detail below. Kitchen, 110 Wn.2d at 409-11.

The jury in Aguilar's trial was not given a Petrich instruction concerning rape.[8] Nor did the State make a clear election. It instead did the opposite; the State opined at multiple points throughout trial that more than one rape occurred. During opening statements, the prosecutor said that sexual intercourse "was not an option for [A.B.] both on the couch or in the bedroom. They are both rape in the first degree." This was followed by two similar statements in closing. First: "after he raped her on the couch . . . [h]e took her to the bedroom, closed the door, she said no, she said stop and he raped her." And then, when discussing jury instructions:

> Rape in the first degree. When the defendant sexually assaults her on the couch. . . . Then sexual intercourse. Both when he rapes her in the bedroom and on the couch.

If this is a multiple acts case, which the State contests, then because no election was made and no Petrich instruction was given, error occurred and the question becomes whether it was harmless.

---

[8] The court did instruct the jury on unanimity concerning Aguilar's assault charges, however.

20

No. 83773-7-I/21

### 1. Whether Multiple Acts of Rape Occurred

Aguilar asserts that we are presented with a multiple acts case. The State counters that while there may superficially appear to be two distinct instances of rape, these acts in fact constituted a "continuing course of conduct." We conclude that this is a multiple acts case.

A Petrich instruction is unnecessary and the State need not elect where what appear to be multiple acts are in fact a "continuing course of conduct." State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989). Common sense is the guiding light of this analysis. Handran, 113 Wn.2d at 17. Generally, a continuing course of conduct is an ongoing enterprise with a single objective but where evidence involves conduct at different times or places, or concerning different victims, then multiple acts have occurred and the jury unanimity right may be implicated. State v. Garman, 100 Wn. App. 307, 313, 984 P.2d 453 (1999).

State v. Lee addressed similar factual circumstances to those here, and the State relies heavily on it. 12 Wn. App. 2d 378, 460 P.3d 701 (2020). Lee concluded that a continuing course of conduct had existed where the defendant's "acts of sexual penetration involved the same victim, occurred in one place, occurred within a brief period of time, less than 10 minutes, and occurred for the single purpose of Lee's sexual gratification." 12 Wn. App. 2d at 397.[9]

---

[9] Aguilar in turn relies on State v. Tili, 139 Wn.2d 107, 985 P.2d 365 (1999). Tili was not a unanimous jury case, and Lee distinguished it on that basis. Lee, 12 Wn. App. 2d at 397. Tili instead asked whether double jeopardy prevented the State from charging the defendant with three rapes when he first

21

Though superficially similar, the facts here are more nuanced. According to A.B.'s testimony,[10] Aguilar first raped her on her couch. During this period, while he was threatening A.B. and berating her for dating other men, Aguilar "would get distracted and do other things." Holding a knife, he paced around her apartment, stabbed the couch cushions near A.B., stabbed the wall, broke her belongings, and shredded her underwear close to her face. The order of events is understandably unclear, but A.B. testified that they perhaps lasted for five to ten minutes. Aguilar eventually became distracted enough that he "was in and out of the kitchen" and "in and out of . . . [A.B.'s] view," and she was able to maneuver to close her legs and sit up without him becoming angry.

Asked to describe what happened next, A.B. testified:

Multiple events. I don't always remember the, I don't feel like I remember the order exactly. There was, there's a time early on where he had said that he had lost pieces of foil with heroin on them in the house, and so he had made me try to help look for

---

inserted his fingers into the victim's vagina, then her anus, and finally inserted his penis into her vagina. 139 Wn.2d at 111-13. It concluded that the statutorily defined unit of prosecution for rape was "any" penetration and upheld the convictions. Tili, 139 Wn.2d at 114-15. Aguilar argues by analogy that where, as here, multiple units of prosecution exist, a Petrich instruction should be given.

The two tests do share terminology. See State v. Villanueva-Gonzalez, 180 Wn.2d 975, 985-86, 329 P.3d 78 (2014) (engaging in "continued course of conduct" analysis when determining whether what were charged as multiple assaults should be considered one for double jeopardy purposes). And, to an extent, they share an inquiry: determining whether to legally encode complex and continuing crimes as single or plural. But they are fundamentally different. Double jeopardy identifies the limits of the State's charging powers given certain factual circumstances; jury unanimity concerns itself with whether—when the State has *not* exceeded its charging powers and has charged less than it could— a jury's verdict is unambiguously unanimous.

[10] Aguilar testified that the sexual intercourse on the couch and bedroom were part of one continuous act.

> them, like on my knees crawling around trying to look for that. And he was also taking alcohol from the kitchen and tried to get me to drink alcohol as well. I remember him bringing over a bottle of wine of mine that was new and opening it. And he said "Drink that." And I do remember saying "I just got home. If I drink all this, I'm going to vomit because I haven't eaten dinner yet." And he was like "Good. I want you to be drunk during this."
>
> . . . .
>
> As far as the wine, I kind of like would pretend to take partial sips to appease him, and then I just kept setting it down. Then I eventually set it on the ground and at some point, it kind of got kicked over when he was pacing around and being irate, and so I just let it fall over and drain onto the ground.
>
> . . . .
>
> I don't know the timeframe, again, but at another point, he had forced me to go into the bedroom from the couch.

He then forcibly undressed A.B. and raped her on the bed.

We conclude that the facts here are consistent with multiple acts rather than a continuing course of conduct. The relevant conduct occurred in A.B.'s apartment and A.B. was the only victim, facts that admittedly indicate a continuing course of conduct rather than multiple acts. But the timeline of events, although uncertain, indicates that numerous activities may have intervened between the events on the couch and in the bedroom. Some of these activities—searching for and doing drugs, pretending to sip wine—appear to have been somewhat prolonged endeavors. And Aguilar's state of mind does not demonstrate the existence of "an ongoing enterprise with a single objective." Garman, 100 Wn. App. at 313. Instead he acted erratically under the influence of intoxicants, his focus shifting rapidly from one thing to another. These are not the qualities of a continuing course of conduct.

No. 83773-7-I/24

Because an error occurred, we must now consider whether it was harmless.

### 2. Harmless Error

If neither a Petrich instruction nor a clear election occurs in a multiple acts case, there is constitutional error stemming "from the possibility that some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." Kitchen, 110 Wn.2d at 411. Harmless error analysis then determines whether reversal is appropriate. Kitchen, 110 Wn.2d at 409-10. This analysis holds that "when trial error abridges a right guaranteed to the defendant by the United States Constitution, the jury verdict will be affirmed only if that error was 'harmless beyond a reasonable doubt.' " Kitchen, 110 Wn.2d at 409 (quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). An error is harmless "only if *no* [rational trier of fact] could have a reasonable doubt as to any of the incidents alleged." Kitchen, 110 Wn.2d at 411 (emphasis added).

This is a high standard. Courts that have affirmed multiple acts cases despite finding error tend to do so because there is no material difference in the evidence supporting one act and the evidence supporting another. In State v. Camarillo, for instance, a child victim described the instances of indecent liberties, which the defendant responded to with a blanket denial. 115 Wn.2d 60, 66-67, 794 P.2d 850 (1990). The court affirmed because " 'proof of the substantially similar incidents relied upon a single witness' detailed,

24

uncontroverted testimony, and . . . [the defendant] offered no evidence upon which the jury could discriminate between the incidents.' " Camarillo, 115 Wn.2d at 70 (quoting State v. Camarillo, 54 Wn. App. 821, 828, 776 P.2d 176 (1989)). Similarly, in State v. Bobenhouse, the defendant offered only a general denial by which to controvert the victim's testimony as to two separate instances of rape, and the court affirmed. 166 Wn.2d 881, 894, 214 P.3d 907 (2009).

That pattern is not present here. Aguilar admitted to sexual intercourse both on the couch and in the bedroom, as he had to, given the DNA evidence and evidence of lubricant on A.B.'s couch. His defense instead focused on consent and attempted to puncture A.B.'s credibility by highlighting what he characterized as inconsistencies with her story and between her testimony and the physical evidence. He pointed to the volatility of their relationship, asserted that the State therefore drew its conclusions that they had truly stopped seeing each other too broadly, and argued that A.B.'s expressions of finality could not be seen as definitive given that history. He pointed to the lack of physical evidence indicating a break-in: no broken window, and no fingerprints on or around the window. He pointed to the absence of any fingerprints on the bat itself, perhaps demonstrating that it was not used as alleged. He pointed to the absence of any attempt by the State to present evidence about the history of A.B.'s computer and phone searches on the night in question, which might have corroborated or refuted her testimony that Aguilar used her phone to look at her dating profiles. He pointed to the absence of testimony from A.B.'s neighbors, who might have

25

confirmed that they heard shouting or, in the alternative, might have testified that they often heard shouting from A.B.'s apartment, indicating a pattern of behavior between the two. He pointed to the absence of any of A.B.'s ripped work clothes in evidence, even though A.B. had testified that Aguilar tore her clothes apart. He pointed to A.B.'s sexual assault examination, which found no signs of trauma to her sexual organs. He asserted that the visible damage to her neck was minor and more consistent with consensual choking than strangulation. And he testified that the two of them together caused the damage to her apartment after they had had sex, rather than over the course of the evening, as A.B. contended.

At trial, Aguilar argued that taken together, these individually minor inconsistencies and omissions weakened the State's case and undermined A.B.'s credibility about the history of their relationship and the events of September 11. On appeal, he asserts that the error of not electing an act underlying the rape charge or giving a Petrich instruction cannot be harmless beyond a reasonable doubt. This is because some of his arguments about the weight of evidence and A.B.'s testimony go to one act, some go to the other, and the jury could therefore differentiate between them. At oral argument on appeal—although it had argued that the error could be harmless in its briefing— the State appears to have conceded that the jury unanimity error is not harmless beyond a reasonable doubt.[11]

_____

[11] Asked "if this court would decide that we don't agree with you that it was continuous, how do you get to harmless?," the State answered "I do not, my argument rests on . . . there being . . . a continuous course of conduct." Wash. Court of Appeals oral argument, State v. Aguilar, No. 83773-7-I (June 6, 2023),

We agree that the error is not harmless because a rational trier of fact could find that reasonable doubt exists as to one or both of the acts that served as the basis of the rape charge. Unlike Bobenhouse, Camarillo, and similar cases, the jury in this case had more evidence to weigh and consider than only the victim's testimony countered by the defendant's blanket denial. It was not true that "nothing save the defendant's own testimony controverted or impeached the testimony of the victim." Camarillo, 115 Wn.2d at 72. The manner of Aguilar's entry into the apartment was contested, as were the events leading to sexual intercourse. And Aguilar's argument focused on impeaching A.B.'s testimony by asserting that it did not match the physical evidence. Aguilar's rape conviction violates his right to a unanimous jury.

### Disposition of Rape, Kidnapping, and Robbery on Remand

Because our resolution of Aguilar's jury unanimity arguments informs our analysis of his remaining arguments on appeal, we pause here to consider the disposition of his rape, kidnapping, and robbery convictions and associated enhancements.

Generally, double jeopardy allows "the State [to] retry [a defendant] for the same charge when a conviction is reversed for any reason other than insufficient evidence." State v. Daniels, 160 Wn.2d 256, 265, 156 P.3d 905 (2007). Where insufficiency exists only as to one of the alternative means charged, however,

---

at 13 min., 38 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-cases-for-6623-2023061091/?eventID=2023061091.

retrial is not wholly prohibited. It may occur so long as the State does not re-offer the elevating means unsupported by sufficient evidence to the jury. See State v. Green, 94 Wn.2d 216, 235, 616 P.2d 628 (1980) (remanding for retrial on aggravated murder charge for elevation by first degree rape, but not for elevation by kidnapping, which was unsupported by sufficient evidence). Alternatively, where the jury was instructed on a lesser included offense and the jury necessarily found that the State had proven the elements of that offense beyond a reasonable doubt, the appellate court may vacate the conviction of the greater offense and remand for sentencing on the lesser included offense. In the Matter of the Pers. Restraint of Heidari, 174 Wn.2d 288, 292-94, 274 P.3d 366 (2012).

Here, the jury was instructed on second degree rape, a lesser included offense of first degree rape. If we were concerned only with Aguilar's alternative means arguments, this would leave us the option to remand for resentencing on the lesser included crime, since the insufficiently proven elements of first degree rape are limited to its elevating means. But the State's failure to elect, coupled with the trial court's failure to give a Petrich instruction, prohibits that remedy. Our only remaining option is to vacate his rape conviction entirely. We note that if the State chooses to retry Aguilar for rape on remand, it may not instruct the jury on the insufficiently proven alternative means: felonious entry into the building in which A.B. was situated.

Given that, we must also address Aguilar's kidnapping conviction. The jury was instructed that it could elevate Aguilar's kidnapping offense to the first

28

degree by any of five means. One of those was that the kidnapping was done "to facilitate the commission of Rape." See RCW 9A.40.020(1)(b) (allowing elevation if done to facilitate the commission of "any felony"). The jury was not instructed on a lesser included offense, nor was it provided a special verdict form to specify what means it relied on to elevate Aguilar's kidnapping offense. With no remaining rape conviction, we cannot conclude that the jury determined that Aguilar kidnapped A.B. with the intent to facilitate rape; the intent and the act are too intertwined under the facts of this case. We therefore must vacate Aguilar's kidnapping conviction as well.

The jury was also instructed on robbery in the second degree, a lesser included offense of robbery in the first degree. Once again, the only elements left not proven are the elevating means, leaving us the option to remand for retrial. But the State specifically requests a directed sentencing on the robbery charge should we find one of its elevating means unsupported. On this offense, we remand for resentencing on the lesser included.

Finally, the jury found through a special verdict form that Aguilar was armed with a deadly weapon when he committed first degree rape and first degree kidnapping. Aguilar urges us to vacate the deadly weapon enhancement alongside his convictions. He relies on State v. Davis, 177 Wn. App. 454, 465 n.10, 311 P.3d 1278 (2013). There, the court vacated a firearm enhancement because it had vacated the underlying offense, reasoning that RCW 9.94A.533, the firearm enhancement statute, does not provide a basis for imposing a

sentence for a freestanding enhancement. Davis, 177 Wn. App. at 465 n.10.

We follow suit and vacate the jury's deadly weapon findings as it relates to

Aguilar's rape and kidnapping convictions.

### Merger of Assault and Kidnapping

Aguilar contends that double jeopardy acts to prohibit his punishment for

both rape and its elevating offenses of kidnapping and assault, and kidnapping

and its elevating offense of assault. Because we vacate his rape and kidnapping

convictions, we do not address this argument.

### Same Criminal Conduct

Lastly, Aguilar contends that the trial court abused its discretion when it

found that his burglary, assault, and rape convictions were not the same criminal

conduct. We disagree.

A trial court may impose sentences with a range of possibilities calculated

by considering both the seriousness of the crime and the defendant's criminal

history. RCW 9.94A.530. The defendant's criminal history is reduced to an

"offender score" representing the sum of numerical values assigned to prior

offenses, with more serious crimes carrying higher values. RCW 9.94A.525. If a

defendant is being sentenced for more than one offense, "prior" offenses include

all current and past convictions. RCW 9.94A.589(1)(a).

If, however, the defendant is being sentenced for two or more offenses

that the court finds are "the same criminal conduct," current offenses are counted

as only one crime for the purposes of the offender score calculation.

RCW.9.94A.589(1)(a). This might result in a lower range of possible sentences.

"Same criminal conduct" is defined to mean "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW.9.94A.589(1)(a). Since the three crimes—burglary, rape, and assault—here all concern the same victim, we focus on the first two factors.

"Same criminal intent" is not a subjective analysis into the defendant's actual intent when committing the crimes. State v. Dunaway, 109 Wn.2d 207, 214, 743 P.2d 1237 (1987). Instead, the analysis concerns "the extent to which the criminal intent, as objectively viewed, changed from one crime to the next." Dunaway, 109 Wn.2d at 215. This objective intent is also not the same as the mens rea element of the offense—otherwise different crimes would inherently be done with different intent, making the same criminal conduct test redundant. State v. Kloepper, 179 Wn. App. 343, 357, 317 P.3d 1088 (2014).

Because they involve questions of fact, a trial court's conclusions regarding same criminal conduct are reviewed for an abuse of discretion. State v. Graciano, 176 Wn.2d 531, 536, 295 P.3d 219 (2013). "Under this standard, when the record supports only one conclusion on whether crimes constitute the 'same criminal conduct,' a sentencing court abuses its discretion in arriving at a contrary result." Graciano, 176 Wn.2d 531 at 537-38. "But where the record adequately supports either conclusion, the matter lies in the court's discretion." Graciano, 176 Wn.2d 531 at 538.

Here, the trial court found that the offenses were not the same criminal

31

conduct, and we conclude that it did not abuse its discretion. Because we have vacated Aguilar's rape conviction, we do not consider it as part of this analysis, leaving only consideration of his burglary and assault convictions. The trial court did not abuse its discretion by concluding that these are not the same criminal conduct, since Aguilar completed his burglary before any of the acts that constituted his conviction for assault even began.

CONCLUSION

We vacate Aguilar's convictions of first degree rape and first degree kidnapping and remand for further proceedings consistent with this opinion. We also vacate his conviction for first degree robbery and remand specifically for resentencing on second degree robbery. We otherwise affirm.[12]

_____
Smith, C.J.

WE CONCUR:

_____          _____
Birk, J.                          Coburn, J.

_____

[12] The Washington State Coalition Against Domestic Violence has identified 1,107 homicides, 327 suicides, and 74 police intervention deaths that resulted from domestic violence between 1997 and 2022. Washington State Domestic Violence Fatalities by County, WASHINGTON STATE COALITION AGAINST DOMESTIC VIOLENCE (Aug. 4, 2023), https://wscadv.org/wp-content/uploads/2023/04/fatalities-by-county-through-12-31-2022.pdf [https://perma.cc/683N-4ZDE]. Our decisions in this opinion are not meant to minimize the scale or severity of intimate partner violence in our state, nor undermine the seriousness of this case's facts or A.B.'s testimony. However, it is also the case that criminal defendants enjoy important rights and that the State bears a heavy burden to mindfully prosecute its case in fidelity to those rights. It failed in fulfilling that responsibility here.