# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59559-1-II |
| Respondent, | |
| v. | |
| EUGENE D. COSBY, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, A.C.J. — Joan Seedorf lived with her daughter, Jenny N. Purple and Purple's husband, Eugene D. Cosby, in Camas, Washington.[1] Because Joan was elderly, Purple acted as her power of attorney, with Cosby as the successor. This position gave Purple control over Joan's bank accounts.

In 2019, the Camas police department, after a referral from adult protective services, launched an investigation into whether Purple and Cosby were financially exploiting Joan. The investigation revealed that between 2015 and 2020, Purple and Cosby had used large amounts of Joan's funds for their personal benefit and their children's benefit. The State eventually charged Cosby with three counts of first degree theft. Two counts were dismissed by the trial court; a jury convicted Cosby of the remaining count.[2]

---

[1] Because the record references Joan and her husband John, and they share the same last name, we refer to them by their first names for clarity.

[2] The trial court dismissed one of the counts for violating the statute of limitations and the other one for lack of evidence.

Cosby appeals, arguing that his conviction should be reversed because he was deprived of his right to a unanimous jury verdict.

We agree and reverse.[3]

## FACTS

### I. BACKGROUND

#### A. JOAN MOVES TO CALIFORNIA AND PURPLE BECOMES HER POWER OF ATTORNEY

Until 2014, Joan and her husband John lived in New Jersey. In 2014, Joan moved from New Jersey to California to live with their daughter, Purple, and her husband, Cosby, in part to help Purple and Cosby take care of their firstborn child. John remained in New Jersey.

Shortly after Joan moved in with Purple's family in California, Joan's memory was starting to decline. Around this same time, John expressed interest in joining the family in California; however, Joan wanted to keep her finances separate from John's. Because of the combination of Joan's "mild memory loss" and Joan's desire to keep assets separate from John, Joan and Purple made the plan to have Purple become Joan's power of attorney and then to purchase a home together in the Pacific Northwest. Verbatim Rep. of Proc. (VRP) at 456. Purple became Joan's power of attorney in November 2014, with Cosby named as Purple's alternate or successor. Ex. 1 at 155.

As Joan's power of attorney, Purple was authorized to "manage and conduct all of [Joan's] affairs and to exercise all of [Joan's] legal rights and powers." Ex. 1 at 155. Among other things,

---

[3] Cosby also argues that the State committed prosecutorial misconduct during closing argument. Because we are reversing based upon the deprivation of a unanimous verdict, we do not further discuss Cosby's claims related to potential prosecutorial misconduct.

the power of attorney gave Purple broad authority to manage Joan's finances. Purple was authorized to

> [c]onduct any business with any banking or financial institution with respect to any of [Joan's] accounts, including, but not limited to, making deposits and withdrawals, negotiating or endorsing any checks or other instruments with respect to any such accounts, obtaining bank statements, passbooks, drafts, money orders, warrants, and certificates or vouchers payable to [Joan] by any person, firm, corporation or political entity.

Ex. 1 at 155. Purple could also "[s]ell, exchange, buy, invest, or reinvest any assets or property" that Joan owned or would own in the future. Ex. 1 at 155.

The power of attorney also authorized Purple to make gifts on Joan's behalf to individuals "with whom [she had] an established pattern of giving." Ex. 1 at 156; VRP at 758. However, Purple was prohibited from gifting, appointing, or designating any of Joan's assets directly or indirectly to herself, her estate, or her creditors. To avoid any conflicts of interest, Purple was obligated to keep her property separate and distinct from Joan's.

The power of attorney document further cautioned Purple against taking possession of Joan's assets.

> You may not transfer the principal's property to yourself without full and adequate consideration or accept a gift of the principal's property unless this Power of Attorney specifically authorizes you to transfer property to yourself or accept a gift of the principal's property. If you transfer the principal's property to yourself without specific authorization in the Power of Attorney, you may be prosecuted for fraud and/or embezzlement. If the principal is 65 years of age or older at the time that the property is transferred to you without authority, you may also be prosecuted for elder abuse. . . .

Ex. 1 at 162-63; VRP at 764-65. As the alternate, Cosby had the same "powers and discretions" as Purple. Ex. 1 at 155.

B. FAMILY'S MOVE TO CAMAS, WASHINGTON

As part of Joan and Purple's joint plan, Purple purchased a home in Camas, Washington, in April 2015 for $515,000. Although the money for the home came primarily from Joan's money, Purple was listed as the home's owner. Joan's money was also used to purchase two vehicles for the family's use in Washington. Purple later described the purchase of the Camas house as a "gift" from Joan. VRP at 463.

Also in 2015, Purple and Joan opened a joint bank account that was mainly funded by Joan's assets. Purple was not employed, so the account's source of income was Joan's deferred compensation retirement benefits from her time as a teacher in New Jersey as well as her social security benefits. Purple would use the joint account to pay for things such as her children's schooling and daycare, Cosby's child support obligations, restaurants, vacations, Cosby's business, and repairs to the home.

C. ADULT PROTECTIVE SERVICES INVESTIGATION

In November 2017, John moved to Washington and joined Joan and the family in the Camas house. About a year after John moved in, in November 2018, Joan and John suspected that Purple and Cosby might be stealing from them, so John made a report to police and to adult protective services (APS).

An APS investigator visited the Camas house and reviewed bank statements from their joint account. A hearing on the matter was eventually scheduled for the first week of March 2020.

Following the hearing, Greg Swanson was appointed as Joan's guardian ad litem. Swanson determined that Joan was not capable of managing her finances. While Joan had been physically well cared for by Purple and Cosby, Swanson determined that Purple's frequent use of the account

4

for the benefit of herself, Cosby, and their children violated Purple and Cosby's obligations under the power of attorney. He found that 97.8 of the funds from Purple and Joan's joint account came solely from Joan. Swanson specifically took issue with checks that had been written from the joint account directly to Purple, Cosby, and their children that were "clearly not for Joan['s] . . . benefit." VRP at 831. Even if the checks were characterized as gifts, that was not acceptable under the power of attorney.

Despite Swanson's findings, he believed that a civil settlement was in Joan's best interest so that she could continue living with Purple and Cosby.

D. Criminal Charges are Brought Against Purple and Cosby

Although Swanson advocated for a non-criminal solution, law enforcement reached a different decision. In October 2021, following the police investigation, the State charged Purple and Cosby with multiple counts related to the theft of Joan's (and/or John's) money through multiple transactions occurring between 2015 and 2021. Cosby was charged with three counts. Two of the counts against Cosby were dismissed by the trial court, so the only count that was decided by a jury trial was for first degree theft between June 2, 2015, and May 1, 2020.

II. Deborah Carroll's Trial Testimony

Deborah Carroll was a forensic accountant for the police investigation into Purple and Cosby. Her testimony focused on her analysis of Purple's, Cosby's, and Joan's bank statements, deposits, and withdrawals that had been obtained by the police.

Carroll explained in detail her findings about Purple and Joan's joint bank account between 2015 and 2020, listing checks that were written to pay for childcare, Cosby's business, Cosby's child support obligations, legal expenses, as well as personal checks written to Purple, Cosby, and

their children. Although there were many transactions where Carroll could easily identify whether they were for Joan's benefit or for the rest of the family's benefit, there were some checks issued from the joint account that Carroll could not discern for whose benefit they were issued.

III. JURY INSTRUCTIONS

After the presentation of evidence, the trial court instructed the jury. The to-convict instruction for first degree theft provided that the jury would have to find,

> (1) That on or about or between June 2, 2015, through May 1, 2020, the defendant, EUGENE COSBY, wrongfully obtained or exerted unauthorized control over property of another;
>
> (2) That the property exceeded $5,000 in value;
>
> (3) That the defendant intended to deprive the other person of the property;
>
> (4) That this act occurred in the State of Washington.

Clerk's Papers (CP) at 72. The jury was also instructed that so long as a series of transactions was part of a "common scheme or plan," they were permitted to aggregate the total of multiple transactions to meet the $5,000 required for first degree theft. CP at 75.

However, the jury was not asked to make an express finding as to whether the transactions were part of a common scheme or plan. The jury was also not given a unanimity instruction, which would have instructed the jury that it had to be unanimous about which specific transactions were being used to find Cosby guilty.

IV. THE STATE'S CLOSING ARGUMENT AND THE JURY VERDICT

The State began its closing argument with a timeline of the events of the case, starting in 2014 when Joan first moved in with Purple and Cosby. The State then continued to describe the transactions that took place while Purple was Joan's power of attorney.

The State showed the jury a table, which listed different withdrawals from Purple and Joan's joint account for Cosby's personal bank account, Cosby's business, or Cosby's child support payments.

| Transaction Date | No | Detail | Memo Line | Withdrawal |
|---|---|---|---|---|
| 4/7/2017 | 126 | NYS Child Support Processing Center | Eugene Cosby III – BQ90582M1 | $1,200.00 |
| 4/12/2017 | 127 | Eugene Cosby – BofA – [XXX-XXX-XXX] | | $1,800.00 |
| 5/22/2017 | 357 | NYS Child Support Processing Center | Eugene Cosby III – BQ90582M1 | $2,000.00 |
| 6/5/2017 | 366 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | | $3,000.00 |
| 8/11/2017 | 379 | Eugene Cosby – BofA – [XXX-XXX-XXX] | | $3,000.00 |
| 10/12/2017 | 485 | NYS Child Support Processing Center | Eugene Cosby III – BQ90582M1 | $1,000.00 |
| 10/23/2017 | 486 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | | $1,000.00 |
| 12/19/2017 | 498 | NYS Child Support Processing Center | Eugene Cosby III – BQ90582M1 | $4,012.56 |
| 1/28/2018 | 509 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | | $1,500.00 |
| 4/26/2018 | 535 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | | $2,828.28 |
| 6/1/2018 | 541 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | Apple | $1,700.00 |
| 7/27/2018 | 554 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | business expenses | $4,000.00 |
| 9/11/2018 | 563 | NYS Child Support Processing Center | Eugene Cosby III – BQ90582M1 | $4,000.00 |
| 12/7/2018 | 593 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | | $9,000.00 |

| | | | | |
|---|---|---|---|---|
| 4/24/2019 | 250 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | | $2,000.00 |
| 7/16/2019 | 140 | NYS Child Support Processing Center | Eugene Cosby III – BQ90582M1 | $1,000.00 |
| 8/20/2019 | 157 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | | $2,000.00 |
| 9/17/2019 | 452 | NYS Child Support Processing Center | Eugene Cosby III – BQ90582M1 | $1,000.00 |
| 10/11/2019 | 455 | Eugene Cosby – Green Mint – BofA - [XXX-XXX-XXX] | | $4,000.00 |
| | | | **TOTAL** | **$50,040.84** |

Ex. 34; CP at 230.

Notwithstanding the specific transactions listed on the table, the State did not focus the jury on any particular transaction or combination of transactions. Instead, the State repeatedly argued that the listed transactions were "just the tip of the iceberg" and that there was more that could convict Cosby. VRP at 1148.

> *And this is just the tip of the iceberg* that, in this period of time, these checks, just a few checks, total $50,000 to Eugene or Green Mint. $50,000 to Eugene or Green Mint or, I'm sorry, also including the New York Child Support payments. $50,000. That's substantially more than $5,000, *and that is just the tip of the iceberg.*
>
> The [S]tate has proved beyond a reasonable doubt that property taken exceeded $5,000 in value. The [S]tate has proved beyond a reasonable doubt that Mr. Cosby wrongfully obtained or exerted unauthorized control of the property of another.

VRP at 1148.

The jury found Cosby guilty of first degree theft. Cosby appeals.

8

ANALYSIS

Cosby argues that he was denied his right to a unanimous jury verdict for committing first degree theft in an amount greater than $5,000 between 2015 and 2020. The State concedes error but argues that the error was harmless. We agree with the parties that the trial court erred, and we agree with Cosby that the error was not harmless.

Criminal defendants are guaranteed the right to a unanimous jury verdict under both our federal and state constitutions. U.S. CONST. amend. VI; Const. art. I, § 22. Issues of jury unanimity often occur when the State alleges that the defendant committed multiple acts of misconduct, and any one of them could be the basis for the charged crime. *See, e.g.*, *State v. Aguilar*, 27 Wn. App. 2d 905, 924, 534 P.3d 360 (2023) (defendant challenged unanimity of jury verdict when there were two distinct instances of criminal conduct); *State v. Bobenhouse*, 166 Wn.2d 881, 894, 214 P.2d 907 (2009) (defendant challenged unanimity of jury verdict when the victim testified that the defendant "regularly" sexually assaulted him).

In these "multiple acts" cases, there are two ways to protect the defendant's right to a unanimous verdict: (1) the State elects which specific act it is relying on to convict the defendant or (2) the trial court provides a "*Petrich*"[4] or unanimity instruction and "instruct[s] the jury that it must unanimously rely on a specific criminal act to support its conviction." *Aguilar*, 27 Wn. App. 2d at 924. Either the State's election or the trial court's unanimity instruction ensures that all 12 jurors agree that the same criminal act has been proved beyond a reasonable doubt. *State v. Coleman*, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007).

---

[4] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

If, in a multiple acts case, there is neither an election nor a unanimity instruction, prejudicial error is presumed. *Id.* Without these safeguards, the possibility opens for some jurors to rely on one act or incident while others rely on others—or a "lack of unanimity." *Id.* "[E]ach juror may arrive at a guilty verdict by responding to testimony about discrete incidents—incidents which, if an election were made, the jury may not all agree occurred." *Id.*

We will reverse a conviction based on this error unless the State can prove that the error was harmless beyond a reasonable doubt. *Id.* In this context, error is harmless "only if no rational juror could have a reasonable doubt as to any of the incidents alleged." *Id.* Because such error meets the manifest constitutional error requirement in RAP 2.5, it may be raised for the first time on appeal. *Aguilar*, 27 Wn. App. 2d at 918.

While this bar is high, courts have found this error to be harmless when "there is no material difference in the evidence supporting one act and the evidence supporting another." *Id.* at 928. For example, in *Bobenhouse*, our Supreme Court held that the absence of a unanimity instruction was harmless even though the victim testified about two separate acts of rape. 166 Wn.2d at 894-95. The court explained any error was harmless because both incidents were "independently capable" of supporting the charge and the defendant responded to the victim's allegations with only a "general denial," without offering evidence that would allow the jury to discriminate between the two incidents. *Id.* at 894-95. The court reasoned, "if the jury . . . reasonably believed that one incident happened, it must have believed each of the incidents happened." *Id.* at 895. Put another way, with the only evidence being the testimony from the victim and the general denial of the defendant (that did not differentiate between the two incidents), the jury was left with the

choice to either believe the victim or the defendant. And, because the jury convicted the defendant, the jury believed the victim and must have believed that the two instances occurred. *Id.*

In contrast, our Supreme Court has held that when there is "conflicting testimony" regarding the occurrence of some of the instances, the lack of unanimity instruction was reversible error. *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988) *abrogated on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014). The *Kitchen* court explained that because the defendant and other witnesses introduced evidence that contradicted the victim's allegations and both the victim and the defendant's general character and reputations, "a rational juror could have entertained reasonable doubt as to whether one or more of them actually occurred." *Id.* at 412.

Here, in order to convict Cosby of first degree theft, the State was required to prove that he wrongfully obtained or exerted unauthorized control of Joan's property in an amount exceeding $5,000 between June 2, 2015, and May 1, 2020. RCW 9A.56.400(1)(a).

To achieve this minimum amount, the State could have avoided the concerns raised in "multiple acts" cases by having the jury find that the multiple thefts were part of a "continuing course of conduct." *See State v. Garman*, 100 Wn. App. 307, 309, 317, 984 P.2d 453 (1999), *review denied*, 141 Wn.2d 1030 (2000) (explaining that if the jury found that the multiple acts were part of a common scheme or plan then "the multiple incidents of theft may be considered as part of a continuing course of conduct"); *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (explaining that either a *Petrich* instruction or an election is required only when "the State presents evidence of 'several distinct acts,' " not when it presents evidence of a " 'continuing course of conduct' " (internal quotation marks omitted) (quoting *State v. Petrich*, 101 Wn.2d 566, 571,

11

683 P.2d 173 (1984)).  But this requires that the jury make an *express finding* that the thefts were part of a "common scheme or plan, a continuing course of conduct, and a continuing criminal impulse." *Id.*  Without this express finding, an election from the State or a unanimity instruction from the trial court was required in order to protect Cosby's right to a unanimous verdict.  *Id.*

Cosby argues that none of the unanimity protections occurred here—no express jury finding of a common scheme or plan or a continuing course of conduct, no election from the State, and no *Petrich* instruction.  Although the jury was generally instructed on the definition of a "common scheme or plan," the jury was not asked to make an express finding that the transactions constituted such a scheme or plan.  And although the State provided a chart of transactions to the jury during closing argument, Cosby argues that the State failed to clearly elect because it also suggested that the chart represented just the "tip of the iceberg" and that many other transactions could be used for conviction.  And, finally, the trial court never provided a *Petrich* instruction.  According to Cosby, this was error.

Cosby also contends that the State cannot show that this error was harmless beyond a reasonable doubt.  He specifically points out that many of the transactions needed to be aggregated because they were less than the $5,000 threshold.  He also contends that the evidence about some of the transactions was conflicting—testimony suggested that some of the payments were actually for Joan's benefit and some were impossible to discern.  Because of this conflicting testimony, some jurors could have relied on different transactions to find Cosby guilty, depriving him of a unanimous verdict.  Thus, Cosby argues, his conviction should be reversed.

The State concedes the error.  It appears to concede that it failed to adequately elect specific transactions to support the theft charge (notwithstanding the tables of the transactions).  And the

State also accurately notes that the trial court failed to provide a *Petrich* instruction and that the jury instructions were deficient because they failed to require an express finding of a "common scheme or plan." Br. of Resp't at 5. However, it contends that the error is harmless. Br. of Resp't at 5. The State argues that given the overwhelming evidence supporting Cosby's guilt, no "reasonable jury" would have found Cosby not guilty. Br. of Resp't at 5.[5]

We accept the State's concession that a unanimity error occurred. But we are unpersuaded that the State has shown that the error was harmless beyond a reasonable doubt. While there is uncontroverted evidence that each of the transactions occurred, whether Cosby was authorized to make those transactions using Joan's money was disputed. The State conceded that it was not always possible to tell if some of the transactions were for the Joan's benefit.

In this way, this case differs from *Bobenhouse* where "if the jury . . . reasonably believed that one incident happened, it must have believed each of the incidents happened." 166 Wn.2d at 895. There is no similar clarity here. Given the nature of Joan's relationship with Cosby and the fact that she was living with and being taken care of by him and Purple, there is the possibility that jurors believed that some of the transactions were unauthorized while believing others were either for Joan's benefit or were gifts to him and Purple. Thus, without a unanimity instruction, there is

---

[5] It appears that the State's arguments are rooted in the harmless error test that is typically employed in other contexts. *See* Br. of Resp't at 5-6 (relying on cases regarding confrontation rights and instructional error when outlining the harmless error standard). Instead of applying the harmlessness standard discussed above, the State argues that it is sufficient for it to prove that "there is 'overwhelming evidence of the defendant's guilt that is not tainted by error.' " Br. of Resp't at 5-6 (quoting *State v. Barry*, 183 Wn.2d 297, 303, 352 P.3d 161 (2015)). However, as our Supreme Court has stated, failure to provide a unanimity instruction is harmless "only if no rational juror could have a reasonable doubt as to any of the incidents alleged." *Coleman*, 159 Wn.2d at 512.

the risk that each juror could have relied on a different combination of transactions that they believed were unauthorized to convict Cosby. Reversal is required.

CONCLUSION

We reverse.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, A.C.J.

We concur:

MAXA, J.

GLASGOW, J.