IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39254-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MIGUEL ALEXANDER TORRES, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Miguel Torres appeals multiple convictions stemming from him threatening two people with a gun, kidnapping one of them, and later robbing her of money. He argues that his convictions should be reversed due to evidentiary error but if reversal is not granted, that one of his convictions should be vacated due to merger, his offender score must be recalculated, and one cost should be struck.

We disagree that evidentiary error occurred. But we conclude (1) one of Torres's assault in the second degree convictions must be vacated due to merger; (2) resentencing and recalculation of Torres's offender score is required for the additional reasons that (a) three unconstitutional convictions must be omitted, (b) the offender point for

committing the offense while on probation must be omitted, and (c) the Idaho trafficking conviction must undergo a factual comparability analysis; and (3) the $500 victim penalty assessment must be struck.

## FACTS

Miguel Torres entered a shed where Danny Phipps was living, located on property owned by Chris Hammond. At the time, both Phipps and Hammond were present. Torres put a gun in Phipps's mouth and directed him to call Tawny Scully and ask her to come to the shed. At some point, an additional person, Timothy Cottrell, entered the shed.

Once Scully arrived, Torres hit Scully with his fist and shoved the gun in her mouth. He asked Scully where the drugs and money were. Scully, aware that her late husband had drugs in a storage unit, assumed this was what Torres meant. Torres told Scully to take him to the storage unit, pointed the gun at Cottrell, and directed him to come with them.

The trio entered the storage facility through a security gate by using a code known to Scully. Once at the storage unit, Scully gave Torres a box containing personal items and $6,000 in cash. Torres tried to leave the storage facility, but his car would not start. Scully escaped, and Torres and Cottrell later climbed the security gate.

2

An investigation found a blue latex glove near the disabled car. DNA tests confirmed the near certainty that the glove had been worn by Torres. In an unrelated investigation, law enforcement found a gun in a vent in a common area bathroom in a residence where Torres lived. The barrel of the gun was swabbed for saliva DNA, and tests confirmed the near certainty that the saliva belonged to Scully.

*Procedure*

The State charged Torres with unlawful possession of a firearm in the second degree and also with several other felonies related to the three victims—with respect to Scully—second degree assault, first degree kidnapping, and first degree robbery; with respect to Cottrell—second degree assault and first degree kidnapping; and with respect to Phipps—second degree assault.

Prior to trial, the court ruled on motions in limine. The State informed the court that one witness knew Torres by the moniker "Crook" and did not think the moniker would be used during trial unless identity was an issue. Rep. of Proc. (RP)[1] at 30. It also informed the court that during the incident in the shed, Torres had lifted his shirt to expose some tattoos and shouted "'southside.'" RP at 32. The defense objected to all of this. The trial court directed the State to inform its witnesses to refer to Torres by his

---

[1] "RP" refers to the consecutively paginated verbatim report of proceedings numbered 1 through 882.

name, but if identity became an issue, "it comes in, including any display of any tattoo.

Actions have consequences. It's in." RP at 33.

*References at trial to Torres's moniker and tattoos*

During trial, Cottrell testified he had seen the defendant once, perhaps twice,

before the shed incident. Because Cottrell's identification of Torres was uncertain, the

State sought to prove identity by connecting how Torres had identified himself in the

shed with his street name, which was known to law enforcement.

The court allowed the State to first ask if Cottrell knew the defendant by another

name. The following colloquy ensued:

> [STATE:] . . . [D]uring the course of this, did you learn a . . .
> nickname for [the defendant] at some point? Just yes or no—
> [COTTRELL:] Crook, yes.
> [STATE:] And so you learned he had a nickname. How did you
> come to learn he had a nickname during this?
> [COTTRELL:] In the garage.[2]
> [STATE:] Okay. And did he say that or did someone call him by
> that?
> [COTTRELL:] I'm not quite sure which one that was. But I know I
> heard the nickname.
> [STATE: And what was the nickname?
> [COTTRELL:] Crook.

RP at 242.

---

[2] Referring to the shed-like structure where the initial incident occurred.

4

Scully testified she had never met the defendant until the shed incident. When asked how the defendant identified himself, she answered, "Crook." RP at 534.

Phipps similarly testified he did not know the defendant until the shed incident. He testified that while in the shed, the defendant lifted up his shirt, exposed his tattoos, and said he was a "southsider." RP at 161. Phipps described the tattoos to the jury as words around the defendant's neck and over his heart, three dots and two bars. The State then asked Phipps to look at a photograph of the defendant's chest, and Phipps confirmed that the tattoos in the photograph were those he had described to the jury.

Detective Luke Flohr testified that Torres used the moniker "Crook." RP at 415. He also described statements the witnesses made to him as part of his investigation. The detective testified that Cottrell referred to Torres only as "Crook," implying that Cottrell did not know Torres's real name. Detective Flohr also testified that Phipps described Torres's tattoos.

*Verdict and sentence*

The jury convicted Torres of the charged crimes, except those related to Cottrell as the victim. The trial court sentenced Torres with an offender score that included three prior convictions for possessing a controlled substance, one point added for committing the offenses while on community placement, and an Idaho conviction for trafficking in methamphetamine.

Torres appealed.

ANALYSIS

ADMISSION OF EVIDENCE

Torres argues the trial court erred by admitting evidence that painted him as a Latino gang member—his moniker, his self-identification as a "southsider," and his tattoos. He additionally argues that the relevance of this evidence was substantially outweighed by its unfair prejudice. We disagree.

A court may not admit "other crimes, wrongs, or acts" to prove propensity to commit the charged crimes. ER 404(b). This rule bars not only bad acts, "but *any* evidence offered to 'show the character of a person to prove the person acted in conformity' with that character." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (alteration in original) (quoting *State v. Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002)). Moreover, ER 404(b) must be read alongside ER 403, to ensure that the risk of a propensity inference is not substantially outweighed by its probative value. *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

Here, the State's witnesses did not know Torres, but their identification of him was a central issue in the case. Numerous studies have shown the fallibility of eyewitness identification evidence, especially identification of a person whose ethnicity is different than the witness's ethnicity. *See Manson v. Brathwaite*, 432 U.S. 98, 97 S.

Ct. 2243, 53 L. Ed. 2d 140 (1977). Given this, it would have been unreasonable for the trial court to limit the witnesses' identification of Torres as the person sitting opposite of them at trial.

In general, we review a trial court's evidentiary rulings for an abuse of discretion and will reverse only if no reasonable judge would have decided the matter as the trial court did. *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004). To the extent the challenged evidence tended to identify Torres as a gang member, and it did tend to, the record shows the State elicited the evidence rarely, only as identifiers or as consistent prior statements the witnesses made to the detective. Critically, the State did not highlight the evidence in any manner to argue that Torres was in a gang or that he was a bad person. Given how crucial proof of Torres's identity was to the State's case, we cannot say that no reasonable judge would have admitted the challenged evidence. We conclude the trial court's evidentiary rulings were not an abuse of discretion.[3]

DOUBLE JEOPARDY

Torres argues his double jeopardy rights were violated when the trial court failed to merge his assault in the second degree conviction with his kidnapping in the first degree conviction. The State, citing *State v. Davis*, 177 Wn. App. 454, 461-62, 311 P.3d

---

[3] Moreover, error, if any, was nonprejudicial. The State's other evidence—summarized on pages 20-22 of its brief—convinces us that a jury would have convicted Torres in the absence of the challenged evidence.

7

1278 (2013), concedes that the assault conviction (involving Scully) merged into the more serious kidnapping conviction. The State notes that Torres committed the two offenses when he stuck the gun into Scully's mouth and abducted her. We accept the State's concession.

PRIOR CONVICTIONS

Torres argues he is entitled to resentencing because his offender score must be recalculated. He argues (1) the three unconstitutional possession of controlled substance convictions should be omitted, along with the point for committing a crime while on community placement, and (2) his Idaho conviction for trafficking in methamphetamine should either be omitted or we should remand for the trial court to conduct a comparability analysis. The State concedes the first issue and argues remand for a comparability analysis of the Idaho conviction is required. We mostly agree.

*Unconstitutional convictions*

A prior conviction that later is determined unconstitutional may not be included in an offender score. *State v. Ammons*, 105 Wn.2d 175, 187, 713 P.2d 719, 718 P.2d 796 (1986). Recently, in *State v. Blake*, 197 Wn.2d 170, 186, 481 P.3d 521 (2021), our Supreme Court ruled that Washington's strict liability drug possession statute was unconstitutional. Accordingly, Torres's three prior convictions for unlawful possession of a controlled substance, along with his one-point increase for committing a current

8

offense while on community placement or custody, should be omitted from his criminal history.

*Idaho's trafficking in methamphetamine statute*

Idaho's trafficking in methamphetamine statute is not legally comparable to a Washington felony. In Idaho, "[a]ny person who knowingly delivers, or brings into this state, or who is knowingly in *actual or constructive possession of*, twenty-eight (28) grams or more of methamphetamine . . . is guilty of a felony." Idaho Code § 37-2732B(a)(4) (emphasis added). This statute can thus be violated by mere possession of methamphetamine. *State v. McIntosh*, 160 Idaho 1, 5, 368 P.3d 621 (2016). The statute is thus broader than any otherwise comparable Washington felony in light of *Blake*, 197 Wn.2d at 186.

Nevertheless, depending on the underlying facts of the Idaho conviction, the trafficking conviction could be comparable to a Washington delivery of a controlled substance conviction. We remand for a factual comparability analysis.

VICTIM PENALTY ASSESSMENT

The trial court imposed a $500 victim penalty assessment (VPA). The legislature subsequently amended the relevant statutes to prevent requiring indigent defendants to pay this fee. LAWS OF 2023, ch. 449, §§ 1, 4. This change applies prospectively to cases pending on direct review. *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018).

9

No. 39254-6-III
*State v. Torres*

Here, the trial court found Torres indigent. We direct the trial court to strike the $500 VPA.

Affirmed in part, and remanded for resentencing to recalculate offender score, and strike the VPA.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

WE CONCUR:

Fearing, J.

Staab, J.

10